**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**UNITED STATES OF AMERICA,**
**FOR THE USE AND BENEFIT OF**
**MCKENNEY'S, INC.,**

             **Plaintiff and**
      **Counterclaim Defendant,**

      **v.**                            **CIVIL ACTION NO. 4:20cv179**

**LEEBCOR SERVICES, LLC,**

             **Defendant and**
  **Counterclaim Plaintiff, and**

**THE CINCINNATI INSURANCE COMPANY,**

                **Defendant,**

**and**

**LEEBCOR SERVICES, LLC,**

       **Third-Party Plaintiff,**

      **v.**

**THE HARTFORD ACCIDENT AND INDEMNITY COMPANY,**

         **Third-Party Defendant.**

## OPINION AND ORDER

This suit concerns a dispute among entities involved in a federal construction project at Fort Benning, Georgia (the "Project"). A subcontractor on the Project, McKenney's, Inc. ("McKenney's"), and the general contractor, Leebcor Services, LLC ("Leebcor"), both claim that they were damaged by the other's breach of the contract they executed (the "Subcontract" (PX258 or "Subc.")). McKenney's also argues that Leebcor's payment bond surety, the Cincinnati Insurance Company ("Cincinnati"), is liable for the damages caused by Leebcor's alleged breaches of the Payment Bond (DX8 ("Paym. Bond")) it issued pursuant to the Miller Act, 40 U.S.C. §§ 3131-3134. Similarly, Leebcor alleges that McKenney's performance bond surety, the Hartford Accident and Indemnity Co. ("Hartford"), is liable for McKenney's breaches under the Performance Bond (Third-Party Compl. Ex. A ("Perf. Bond") (ECF No. 167-1))) it issued.

The evidence received in this case demonstrates the dynamic nature of complicated construction projects. At every step, the details matter, and coordination and cooperation among the companies tasked with performing the job is essential. Thankfully, as even this case shows, most disagreements that arise as projects evolve are handled during construction, far

2

away from a courthouse, by the professionals who know best how to achieve the ultimate goal of a completed project.

However, once litigation begins, the terms of a written agreement - usually drafted by attorneys - become the measure of success. Here, neither Leebcor nor Cincinnati lived up to the letter of the documents that governed their relationship as it pertained to the Project. For this reason, and as explained in detail below, the court finds that neither party is entitled to damages related to delays allegedly caused by the other, although McKenney's is entitled to receive payment for its Subcontract balance for work performed.

## I. PROCEDURAL HISTORY

McKenney's filed suit against Leebcor and Cincinnati on May 8, 2020. ECF No. 1. On December 9, 2020, Leebcor filed its Answer, ECF No. 49, and Counterclaim, ECF No. 50, arguing that McKenney's is not owed the amounts claimed, and instead that McKenney's owes Leebcor under the Subcontract due to its deficient and untimely work. Cincinnati answered the same day, contending that it was not required to indemnify Leebcor under the Miller Act, and that even if it was, Leebcor does not have a duty to pay McKenney's, meaning that there is no valid claim for Cincinnati to indemnify. ECF No. 50.

On March 2, 2021, Leebcor submitted a claim with Hartford against the Performance Bond for expenses Leebcor alleges

3

McKenney's deficient Subcontract performance caused. ECF No. 85 at 3. On March 26, 2021, Leebcor moved for leave to file a third-party claim against Hartford for McKenney's allegedly deficient work. ECF No. 59. On April 16, 2021, while this motion was pending, Leebcor filed a separate lawsuit against Hartford, alleging that Hartford was responsible for compensating Leebcor for damages allegedly caused by McKenney's. ECF No. 225 Ex. A ("Stipulation of Undisputed Facts" ("Stip. Facts")) ¶ 28. The court ultimately granted Leebcor's Motion for Leave to File a Third-Party Complaint on May 7, 2021. ECF No. 85. Leebcor subsequently dismissed its separate suit and filed its Third-Party Complaint against Hartford on September 3, 2021. Stip. Facts ¶ 28; ECF No. 167. Hartford answered on October 21, 2021. ECF No. 178.

A bench trial in this case began on June 15, 2022. The parties presented evidence and argument over eight (8) trial days, concluding on June 27, 2022. That day, the court took all outstanding issues under advisement. In accordance with the court's direction, the parties filed post-trial proposed findings of fact and conclusions of law, based upon the evidence actually received at trial. ECF No. 264 (Leebcor and Cincinnati); ECF No. 265 (McKenney's and Hartford). The court resolves all outstanding claims with this Opinion and Order.

4

## II. JURISDICTION & VENUE

Federal law creates the cause of action for McKenney's Miller Act claim against the Payment Bond, establishing the court's original jurisdiction over the matter pursuant to 28 U.S.C. § 1331. See Gunn v. Minton, 568 U.S. 251, 257 (2013). The parties remaining claims all allege breach of contract, over which the court exercises its diversity jurisdiction pursuant to 28 U.S.C. § 1332. Such jurisdiction is proper as the parties are completely diverse, and the amount in controversy exceeds the statutory threshold of $75,000. See id. Venue is proper in the Newport News Division of the Eastern District of Virginia because Leebcor's headquarters sits within this Division. See 28 U.S.C. § 1391(b); Local Civ. Rule 3(C).

## III. APPLICABLE LAW

Federal law provides the cause of action for McKenney's Miller Act claim. However, state substantive law governs the remaining breach of contract claims.

"A federal court hearing a diversity claim must apply the choice-of-law rules of the state in which it sits." Res. Banksharess Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941)). Accordingly, the court applies Virginia's choice-of-law principles to determine the applicable substantive law for the parties' breach of contract claims.

5

"[W]here parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction," Virginia courts "will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction." Paul Bus. Sys., Inc. v. Canon U.S.A., Inc., 397 S.E.2d 804, 807 (Va. 1990) (collecting cases).

The Subcontract provides that Virginia law governs disputes arising under it. See Subc. § 24. In addition, the Performance Bond incorporates the Subcontract terms, including its choice-of-law clause, by reference. See ECF No. 167-1; Granite Re, Inc. v. N. Lines Contracting, Inc., 478 F. Supp. 3d 772, 778 (D. Minn. 2020) (enforcing construction contract forum selection clause against performance bond surety where performance bond "incorporate[d] the construction contract without limitation"). Because neither party has shown that the Subcontract's choice-of-law provision is "unfair or unreasonable," or was "affected by fraud or unequal bargaining power," the court will enforce it, and apply Virginia law to resolve the claims for breach of contract before the court. See Paul Bus. Sys., Inc., 397 S.E.2d at 807.[1]

---

[1] Neither party has argued for the application of another state's law to their breach of contract claims, and have consistently addressed Virginia law in their filings and arguments.

6

## IV. PRINCIPLES OF VIRGINIA CONTRACT LAW

### A. Elements of Claim & Purpose of Remedy

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 594 S.E.2d 610, 619 (Va. 2004) (collecting cases). "The remedy for breach of contract is intended to put the injured party in the same position in which it would have been had the contract been performed." Marefield Meadows, Inc. v. Lorenz, 427 S.E.2d 363, 366 (Va. 1993) (citing Appalachian Power Co. v. Walker, 201 S.E.2d 758, 767 (1974)).

### B. Contract Interpretation

"The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." W.F. Magann Corp. v. Virginia-Carolina Elec. Works, Inc., 123 S.E.2d 377, 381 (Va. 1962). Therefore, "[w]hen a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." Palmer & Palmer Co. v. Waterfront Marine Constr., Inc., 662 S.E.2d 77, 80 (Va. 2008) (citing Winn v. Aleda Constr. Co., 315 S.E.2d 193, 194 (Va. 1984)).

7

## C. Proof of Damages

"Proof of damages is an essential element of a breach of contract claim, and failure to prove that element warrants dismissal of the claim." Sunrise Continuing Care, LLC v. Wright, 671 S.E.2d 132, 136 (Va. 2009) (citing Filak, 594 S.E.2d at 614-15). "When a plaintiff has proved a breach of contract, the burden of proof regarding damages does not then shift to the defendant," but instead "remains with the plaintiff to prove with reasonable certainty the measure of damages sustained." Id. at 137.

"Damages based on uncertainties, contingencies, or speculation cannot be recovered." Shepherd v. Davis, 574 S.E.2d 514, 524 (Va. 2003) (citing Barnes v. Graham Va. Quarries, Inc., 132 S.E.2d 395, 397-98 (Va. 1963)). However, plaintiffs "need not establish the specific amount of the loss or damage with absolute certainty." Condominium Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc., 709 S.E.2d 163, 173 (Va. 2011). Indeed, "[w]hen it is 'certain that substantial damage has been caused by the breach of a contract, and the uncertainty is not whether there have been damages, but only an uncertainty as to their true amount, then there can rarely be any good reason for refusing all damages due to the breach merely because of that uncertainty.'" Id. (quoting E.I. DuPont de Nemours & Co. v. Universal Moulded Prods. Corp., 62 S.E.2d

8

233, 254 (1950)). "Proof of absolute certainty as to the amount of loss or damage is not essential when the existence of loss is established and the facts and circumstances proven are such as to permit of intelligent and probable estimate of the amount of damage or loss sustained." E.I. DuPont De Nemours & Co., 62 S.E.2d at 255 (citing Wyckoff Pipe & Creosoting Co. v. Saunders, 9 S.E.2d 318 (Va. 1940)).

### D. Causation

Relatedly, "[a] plaintiff in an action ex contractu, like a plaintiff in an action sounding in tort, bears the burden of establishing a causal connection between the defendant's breach and the damages claimed." Haass & Broyles Excavators, Inc. v. Ramey Bros. Excavating Co., 355 S.E.2d 312, 315 (1987). "The breach of contract must be the direct and proximate cause of the damage[s]" sought, which must also "be naturally and directly traceable to the act of the wrongdoer." See E.I. DuPont de Nemours & Co., 62 S.E.2d at 255. At bottom, "[a] party 'who violates his contract with another should generally be held responsible for all direct and proximate damages which result from such violation,' but damages that 'are so remote as not to be directly traceable to that breach, or are attributable to some other intervening cause, . . . cannot be allowed.'" Rastek Constr. & Dev. Corp. v. Gen. Land Com. Real Estate Co., 806

S.E.2d 740, 748 (Va. 2017) (emphasis in original) (quoting Haass
& Broyles Excavators, Inc., 355 S.E.2d at 315).

## E. Direct & Consequential Damages

Virginia recognizes "two broad categories" of contract
damages: "direct (or general) damages and consequential (or
special) damages." Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.,
214 S.E.2d 155, 160 (Va. 1975) (citing Washington & Old Dominion
R.R. Co. v. Westinghouse Co., 89 S.E. 131, 133 (Va. 1916)).
"Direct damages are those which arise 'naturally' or
'ordinarily' from a breach of contract; they are damages which,
in the ordinary course of human experience, can be expected to
result from a breach. Consequential damages are those which
arise from the intervention of 'special circumstances' not
ordinarily predictable." Id. While direct damages are usually
compensable, consequential damages "are compensable only if it
is determined that the special circumstances were within the
'contemplation' of both contracting parties." Id.

## F. Prejudgment Interest

"Virginia law governs the award of prejudgment interest in
a diversity case." Hitachi Credit Am. Corp. v. Signet Bank, 166
F.3d 614, 633 (4th Cir. 1999). Section 8.01-382 of the Code of
Virginia provides that courts have the discretion to award
prejudgment interest "on any principal sum awarded . . . ." When
exercising its discretion to award such interest, a district

10

court "must weigh the equities in a particular case to determine whether an award of prejudgment interest is appropriate." Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 727 (4th Cir. 2000).

> Underlying a court's weighing of the equities are two competing rationales, the first weighs in favor of granting prejudgment interest while the second cautions against its award. The first is a notion that the party, denied use of money to which it is rightfully entitled, should be compensated for that loss, and full compensation includes interest. By contrast, under the second rationale, some courts are reluctant to award prejudgment interest when the legal dispute is bona fide.

Wells Fargo Equip. Fin., Inc. v. State Farm Fire and Cas. Co., 823 F. Supp. 2d 364, 366-67 (E.D. Va. 2011) (O'Grady, J.) (footnote omitted).

If a court ultimately awards prejudgment interest, the Code of Virginia provides that where "the contract or other instrument does not fix an interest rate, the court shall apply the judgment rate of six percent to calculate prejudgment interest . . . ." Va. Code Ann. § 6.2-302(B).

### V. PROJECT OVERVIEW

#### A. The Structure to be Renovated – Building 3105

In 2016, the United States Army Corps of Engineers ("USACE" or "Government") entered into a contract with Leebcor (the "Prime Contract") to complete the Project: the renovation of an Army barracks at Fort Benning, Georgia. Stip. Facts ¶ 5. The

11

structure to be renovated was known as Building 3105, Starship Barracks. _Id._ As the design/build contractor, Leebcor was responsible for completing the Project design, as well as the actual construction. _See_ _id._ Pursuant to the Miller Act, 40 U.S.C. §§ 3131-3134, Leebcor obtained the Payment Bond for the Project from Cincinnati in the amount of $36,800,206. Stip. Facts ¶ 6.

Building 3105 is a three-story structure with five (5) separate wings laid out in a star-shaped – or "starship" – configuration. _See_ _id._ ¶ 7; Trial Transcript[2] ("Tr.") at 380-83 (Van Schoyck's description of Building 3105). The wings were referred to as "companies." Stip. Facts ¶ 7 The companies surround a central common area referred to as "cadre." _Id._ The companies were identified alphabetically, A through E. _Id._ Figure 1, as appears _infra_ at 13, reflects this configuration.


[Intentionally Left Blank]


---

[2] The eight days of trial transcript are docketed as follows: day one (ECF No. 256, pp. 1-171); day two (ECF No. 257, pp. 171-367); day three (ECF No. 258, pp. 368-610); day four (ECF No. 259, pp. 611-822); day five (ECF No. 260, pp. 822-1053); day six (ECF No. 261, pp. 1054-1250); day seven (ECF No. 262, pp. 1251-1510); day eight (ECF No. 263, pp. 1511-1594).



1st Floor
Building 3105

Figure 1. Excerpt from the Government's Request for Proposal for the Project illustrating the layout of the first floor of Building 3105. PX2/DX71 at LEEB_000000340.

## B. Subcontract Formation

Leebcor employed multiple subcontractors, including McKenney's, to complete the components of the Project. McKenney's and Leebcor executed their Subcontract in June 2017, but the document had an effective date of January 10, 2017. Stip. Facts. ¶ 8; PX258. Under the Subcontract, McKenney's was to perform the plumbing, as well as the heating, ventilation, and air conditioning ("HVAC"), work on the Project. Stip. Facts ¶ 8. The court finds that the Subcontract constitutes a legally enforceable agreement between Leebcor and McKenney's.

## C. Delay Modifications

The Government issued two modifications to the Prime Contract for delays. The first was for a 152-day Government-caused delay to the start of construction on the Project (the "Initial Delay"). Id. ¶ 13. The Government issued a unilateral modification to address the Initial Delay on May 26, 2020 (the "Initial Delay Modification"). Id. ¶ 16.[3]

The second delay was caused by existing structural steel deficiencies in Building 3105 (the "Steel Delay"). Id. ¶ 17. The Government subsequently issued a modification relating to this delay. Id. ¶ 19.

---

[3] The court discusses the Initial Delay and Initial Delay Modification in greater detail below. See infra Part VIII.

14

### D. Summary of Claims

Both parties allege entitlement to damages under the Subcontract for the other's delays and poor work. McKenney's claims damages caused by Leebcor's delays, resequencing of tasks in the Project schedule, and mismanagement, which in turn allegedly caused McKenney's to spend 139 days longer than anticipated on the Project. It also claims that Leebcor has breached the Subcontract by failing to pay it for the work it completed under the agreement. Finally, McKenney's argues that Cincinnati is jointly and severally liable for these damages pursuant to the terms of the Miller Act Payment Bond.

Leebcor responds that it was McKenney's, not Leebcor, who caused substantial project delays, entitling Leebcor to damages under the Subcontract. Leebcor also argues that McKenney's poor quality work required substantial remediation, entitling Leebcor to additional damages. Finally, in its Third-Party Complaint, Leebcor alleges that Hartford is jointly and severally liable for these damages under the terms of the Performance Bond.

### E. Project Management Teams

#### 1. McKenney's Personnel & Second-Tier Subcontractors

Several McKenney's employees were assigned to the Project. Tony Trentini, Division Vice President of McKenney's Building Performance Solutions ("BPS") group, served as the project executive. Tr. at 88-92, 96. Cameron Bradley also worked on the

15

Project in its early stages and was involved in the development of the Project schedule. Tr. at 95, 270. Jonathan Reeves was the McKenney's project manager initially assigned to the Project. Reeves Dep. 22, 36-37. He "helped develop the [Project], get it through design, and transitioned into construction." Id. at 37. Reeves was promoted to senior project manager in January 2017. Id.

At the time of the renovation of Building 3105, Zachary Van Schoyck was employed as a Project Manager with McKenney's. Tr. at 376-77.[4] He took over McKenney's day-to-day management of the Project from Reeves beginning in late September or early October of 2017, during the early stages of McKenney's work. See id. Prior to this time, he was involved in preplanning efforts during the summer of 2017. Tr. at 377. As the manager of McKenney's work on Building 3105, Van Schoyck reported to Trentini. Tr. at 378. McKenney's employed the following supervisors during the Project, among others, all of whom reported to Van Schoyck: Blake Stewart (sheet metal foreman), Hector Vega (mechanical piping foreman), Lee Leitch (plumbing superintendent), and Ed Litzer (plumbing foreman). Tr.

---

[4] Technically, Van Schoyck was initially employed as an assistant project manager, but was promoted to project manager in January 2018. Tr. at 377. Though his title changed at this time, his duties relating to Building 3105 remained the same. Tr. at 377.

16

at 378-79, 1264-65. Brian Cowart was also employed by McKenney's as a Project Executive during the Project. See DX1227.

McKenney's also employed multiple entities to assist it in completing the Subcontract work. Tr. at 379. These second-tier subcontractors included Insulcon to assist with the insulation, Alabama Controls to complete the controls work for the HVAC system, and Georgia Fire Stop to complete the fire caulking work. See Tr. at 379, 417.

### 2. Leebcor Personnel & Other Subcontractors

Steve Mileski, Leebcor's Chief Operating Officer, oversaw Leebcor's project team during the design and construction phases of the Project. Tr. at 863, 872. Jacob Zervakis was Leebcor's project manager, but was not stationed at the job site. Tr. at 959. Reid Wolfe was Leebcor's assistant project manager, and had an office on the job site. See Wolfe Dep. at 17-18; Tr. at 959. Leebcor's quality control team included Taylor Dickerson and James Clark. See, eg., DX226.

Leebcor employed multiple subcontractors other than McKenney's to complete the Project, several of which are relevant to the instant litigation. Leebcor engaged the firm of Goodwyn Mills Cawood ("GMC") to complete the Project designs,[5] Addison Energy Technologies ("AET") to complete the test and

_____

[5] Solutions AEC was the mechanical, electrical, plumbing, and fire protection designer of record "working under GMC as part of [Leebcor's] design team." Tr. at 963.

17

balance ("TAB") and commissioning processes, WindClan to complete the framing and drywall, and Wilson Kitchens to supply and install the mill work[6]. Tr. at 400, 437-38, 459-460, 962-63.

## VI. SUBCONTRACT PROVISIONS

### A. Price & Performance Bond

The original Subcontract price was $10,163,970. Stip. Facts ¶ 9. As required under the Subcontract, McKenney's obtained the Performance Bond from Hartford in the amount of the original Subcontract price. Id. ¶ 10. Once the agreed-upon deduction of $136,329 for McKenney's value engineering ("VE") suggestions, and the agreed-upon change orders expanding McKenney's scope of work were taken into account, the ultimate Subcontract price became $10,197,408.75. PX1434 at 16. Section 3 of the Subcontract described the agreement as a "firm-fixed-price" agreement, and explained that "[u]nless the amount of [the Subcontract] is modified in writing by mutual agreement of the parties, [Leebcor] is not obligated to compensate [McKenney's] beyond" the Subcontract price.

---

[6] The relevant mill work in this case was countertops that had to be installed before McKenney's could complete the installation of certain fixtures. Tr. at 459-60.

## B. McKenney's Scope of Work

The Subcontract defined McKenney's Scope of Work as follows:

> [McKenney's] shall provide all labor, materials, equipment and supervision to perform the Subcontractor Detailed Scope of Work set forth in **Exhibit 1**, . . . attached to and made a part of [the Subcontract], and in accordance with the schedule set forth therein. Seller's proposal dated September 16, 2016 is based on the information in the **RFP entitled "Bldg. 3105 Starship Barracks, Trainee Barracks Upgrade Program (TBUP) Ft. Benning, GA** dated August 15, 2016" prepared by USACE Savannah District.

Subc. § 1 (bolding and underlining in original) (identifying the Request for Proposal ("RFP") admitted as PX2/DX71). McKenney's was required to perform its work "in a competent manner" that "reflect[ed] [McKenney's] best professional knowledge, judgment and accepted industry practice." Id. § 8.

The Detailed Scope of Work required McKenney's to "make the Project complete in every respect insofar as [the] Subcontract is concerned in accordance with the Contract Documents, Plans, and Specifications." Id. Ex. 1, § A. It also specified that McKenney's was to "furnish all material, labor, equipment, insurances, and incidentals necessary to supply and install all material, labor and equipment to complete the HVAC, Plumbing and DDC Controls Scope requirements" in accordance with three documents:

(1) the project specifications ("Plans and Specifications entitled, 'Bldg. 3105 Starship Barracks, Trainee Barracks

Upgrade Program (TBUP) Ft. Benning, GA— 100% Issued for Construction['] dated 02.13.2017 by Goodwyn/Mills/Cawood");[7]

(2) the RFP; and

(3) the Prime Contract.

See Subc. Ex. 1, § B (bolding and underlining omitted).

Section 27 of the Subcontract explained which of these documents would govern in the event of a conflict: "In the event of an inconsistency or conflict between or among the provisions of [the Subcontract] and Construction Documents, the inconsistency shall be resolved by giving precedence to the stricter provision." Subc. § 27.

## C. Design Responsibilities

As the design/build general contractor for the Project, it was Leebcor's responsibility to create the designs McKenney's would rely on to complete its work. See, e.g., PX254 (referring to GMC as being "solely responsible for the ENTIRE design effort"). However, Section One of the Subcontract clarified that McKenney's "scope of work includes responsibility to perform timely reviews of drawings and specifications for the purpose of providing design recommendations to [Leebcor's] design team during the development of the design." Subc. § 1 (underlining in original); Tr. at 109.

---

[7] The operative Specifications were later updated in two contract amendment letters. DX65; PX259. Curiously, neither party moved for the admission of the complete Project Specifications at trial.

### D. Scheduling of Work

### 1. Mutually Agreed Upon Project Schedule

Section 1 of the Subcontract provided that McKenney's was to "follow [Leebcor's] <u>mutually agreeable</u> construction schedule and man the project to maintain this and increase man power should [McKenney's] fall behind." Subc. § 1.[8] The Detailed Scope of Work similarly provided that McKenney's was to complete its work under the Subcontract "according to the <u>mutually agreed upon Published Project Schedule, which [McKenney's] used to establish its fixed-price set forth in Section 3. of [the Subcontract]</u>," and which "<u>displays the critical path tasking and sequence of operations along with major task durations</u>." Subc. Ex. 1, § D. There was no schedule attached to the Subcontract at the time McKenney's executed it.

However, McKenney's agreed that there was a "Mutually Agreeable Project Schedule" at the time it executed the

---

[8] McKenney's executed two contract amendment letters, in September 2017. DX65; PX259. The main purpose of these letters was to add certain drawings to the Subcontract. See DX65; PX259; Tr. at 114, 117, 285-86. However, the letters also provided that McKenney's would "follow [Leebcor's] construction schedule and man the project to maintain this and increase man power should [McKenney's] fall behind." DX65; PX 259. This language appeared to attempt to recite § 1 of the Subcontract the parties previously executed. See Subc. § 1. Trentini inserted the words "Mutually Acceptable" just before the words "construction schedule" in both letters. DX65; PX259. The apparent effect of this was simply to conform the language in the first paragraph of the Contract Amendment Letters to the Subcontract language. See Subc. § 1.

21

Subcontract. Subc. Ex. 1 at LEEB_000000015 ("Y" next to this item on checklist). This is consistent with McKenney's regular participation in the design process beginning in November 2016 and continuing through March 2017. See, e.g., DX162; DX1060; DX1265; DX1142; DX675; Wolfe Dep. at 54; Reeves Dep. at 64, 67, 69, 163; Tr. at 1027, 1029. Ultimately, McKenney's responded to Leebcor's final request for comments concerning the Project schedule on March 31, 2017. DX675 (email from Bradley to Zervakis). Zervakis stated the comments were minor "logic adjustments." Tr. at 1029.

## 2. Sequencing of Work

McKenney's was also required to "begin work on components of [its] Scope of Work to advance the Project Schedule as released by the Project Superintendent, as work areas are reasonably available to begin its Scope of Work in accordance with the durations and sequences set forth in the Published Project Schedule." Subc. Ex. 1, § D (underlining in original).

The Subcontract clearly required McKenney's to adhere to a specified schedule. But it also afforded Leebcor the flexibility to modify it. In the Subcontract, Leebcor "reserve[d] the right to start . . . one task before the preceding one ends." Id. However, Leebcor was also responsible for "adjust[ing] the Schedule bi-weekly" and distributing it "to subcontractors for progress tracking, which may result in start dates for each task

that are not firm and will be fluid due to early starts or late finishes of prior tasks." Id.

The next sentence in Section D of Exhibit 1 outlines how McKenney's may seek recompense for damages incurred due to Leebcor-caused schedule changes:

> To the extent any of the foregoing acts by [Leebcor] alter the current start dates, end dates, durations and planned sequences for the Work set forth in the Published Project Schedule attached to this Agreement, [McKenney's] fixed-price and period of performance for the Work shall be adjusted to the extent they are impacted by such action.

Id. Given its location in the Subcontract, term "foregoing acts" includes Leebcor's (1) "start[ing] work at the direction of the Project Superintendent or Field superintendent," (2) "start[ing] one task before the preceding one ends," (3) "adjust[ing] the Schedule bi-weekly," and (4) "early starts or late finishes of prior tasks." Id. Although the Subcontract directs McKenney's to comply with Government standards throughout, nothing in the document expressly grants McKenney's the right to seek damages from Leebcor for delays to the Project caused by the Government.

The baseline schedule reflected a "two-company plan," meaning that it scheduled work to be ongoing in two companies of Building 3105 simultaneously during the Project, rather than planning for work to occur sequentially, one company at a time. See Tr. at 120-21. Specifically, the plan was to work on Companies A and E concurrently, then B and D concurrently, and

finally C and Cadre concurrently. Tr. at 382. McKenney's disfavored this approach to completing Starship-style barracks based on past experience, because it believed that subcontractors who worked at Fort Benning struggled to keep pace with a two-company schedule. Tr. at 125. The Project ultimately proceeded by sequentially completing A, E, B, D, C, and finally Cadre. Tr. at 382.

### E. Dispute Resolution

Section 14 of the Subcontract addressed how Leebcor and McKenney's were to resolve disputes on the Project. It contains multiple clauses, all of which are relevant to this case.

First, it established a dispute resolution process:

> Any dispute arising here under shall first be resolved by taking the following steps where a successive step is taken if the issue is not resolved at the preceding step: (1) by the technical and contractual personnel for each party performing [the Subcontract], (2) by executive management of each party, (3) by mediation, (4) by arbitration if both parties agree or (5) through a court system of competent jurisdiction. Notwithstanding the dispute, [McKenney's] shall continue to perform its obligations, unless [Leebcor] terminates or otherwise suspends performance hereunder.

Subc. § 14.

The provision also provided that McKenney's was to be bound by certain Government decisions relating to the Subcontract which also concerned the Prime Contract:

> If a decision relating to the Prime Contract is made by the [USACE] and such decision is also related to

24

> [the Subcontract], said decision, if binding upon
> [Leebcor] under the Prime Contract, shall in turn be
> binding upon [McKenney's] with respect to such matter
> <u>if [McKenney's] is allowed to provide any required or
> supporting documentation in the basis of [the USACE's]
> decision.</u> If [Leebcor] elects to appeal any such
> decision of the [USACE], [Leebcor] agrees to promptly
> furnish [McKenney's] with a copy of such appeal. Any
> decision upon appeal <u>of such matter,</u> if binding upon
> [Leebcor], shall in turn be binding upon [McKenney's].
> Pending the making of any decision, either by the
> [USACE] or on appeal, [McKenney's] shall proceed
> diligently with performance of [the Subcontract].

Subc. § 14 (underlining in original).

Section 14 also addressed the issue of attorneys' fees should any dispute between Leebcor and McKenney's result in litigation:

> <u>In the event of any action arising out of or relating
> to [the Subcontract], each party shall bear its own
> costs and expenses, including attorney's fees,
> incurred in connection with such action.</u>([B]oth
> companies are large enough to handle on [sic] fees if
> this occurs[.])

<u>Id.</u> (underlining in original).

### F. Payment

Section 5, entitled "Invoices and Payment Terms," explains as follows:

> Payment on [McKenney's] invoices will be made within
> <u>10 days</u> of [Leebcor's] receipt of payment from [the
> Government] when such payment includes payment for
> amounts properly invoiced by [McKenney's]. [Leebcor's]
> receipt of payment from [the Government] is a
> condition precedent to payment from [Leebcor] to
> [McKenney's]. [McKenney's] right to payment is
> contingent upon [Leebcor's] approval and acceptance of
> the Work, but payment shall not be evidence of
> [Leebcor's] final acceptance of the [McKenney's] Work.

25

Payment shall be subject to subsequent adjustment for shortage and allowance for articles or services rejected. If payment to [Leebcor] from [the Government] is delayed for reason(s) <u>not</u> <u>attributable</u> <u>to [McKenney's]</u>, then [McKenney's] will be paid within 30 days of the date of the approved invoice from [McKenney's].

[McKenney's] agrees that payments owed by [Leebcor] for performance hereunder may be offset by amounts equal to what [McKenney's] owes [Leebcor] under <u>this</u> <u>Agreement</u>. This provision does not apply (1) where there are contractual and/or regulatory restrictions on offsets or (2) where payment on amounts owed [Leebcor] is due to a reasonable dispute.

Subc. § 5 (underlining in original).

## G. Default

Section 12 afforded Leebcor certain rights in the event of McKenney's failure to adhere to the terms of the Subcontract. It explained as follows:

Time is of the essence in the performance by [McKenney's] of the Work. [Leebcor's] right to require strict performance by [McKenney's] shall not be affected by any previous waiver, forbearance or course of dealing. If [McKenney's] breaches any provision hereof . . . , [Leebcor] may, in addition to any other rights it may have hereunder or by law without any liability to [McKenney's], (i) terminate all or part of [the Subcontract] after giving [McKenney's] written notice <u>of the foregoing and [McKenney's]</u> <u>having failed to cure the same within seven (7) days</u> <u>of that notice</u> and <u>thereafter</u> (ii) complete or procure the completion of the performance of the Work at [McKenney's] expense. In such event title to any of [McKenney's] work, whether completed or partially completed, and all materials prepared, procured or set aside by [McKenney's] for use in the Work, shall, at [Leebcor's] option, vest in [Leebcor]. [McKenney's] shall be liable to [Leebcor] for all costs incurred by [Leebcor] in completing or procuring the completion of performance of the Work in excess of the price of the

[Subcontract] (whether or not [Leebcor] exercises its option hereunder).

Subc. § 12.

### H. Remedies

As a general matter, Leebcor remained free under the Subcontract to waive certain provisions while retaining the option to exercise other rights, and pursue remedies provided for, under the Subcontract. Specifically, Section 21 provided that "[w]aiver by [Leebcor] of any provision of [the Subcontract] shall not constitute a waiver as to any other provision and shall not affect the right to thereafter exercise any right or remedy in the event of any other default, whether similar or not." Subc. § 21. This Section is also consistent with Section 12 of the Subcontract, discussed above, concerning Leebcor's right to require strict performance. See Subc. § 12.

However, the Subcontract also contained a liquidated damages provision. It explained that "[l]iquidated damages for [the Subcontract] are **Two Thousand and Nine Dollars and 85/100 Cents ($2,009.85)** for each calendar day the project is not completed on time." Subc. § 28 (bolding and underlining in original). The provision also established that if Leebcor was "delayed because of [McKenney's], then [Leebcor] will assess Liquidated Damages to [McKenney's] to the extent such damages

27

are caused by fault of [McKenney's]." Id. (bolding and
underlining in original).

**VII. MCKENNEY'S CLAIM FOR OUTSTANDING SUBCONTRACT BALANCE**

McKenney's seeks $253,787 from Leebcor for its outstanding
Subcontract balance, which includes both "base" work and amounts
due for approved change order proposals. See Compl. ¶¶ 49-50.
This amount is the sum of McKenney's three (3) unpaid invoices
(the "Invoices"):

    (1) Number 1109889 for $159,988.14, invoiced on
        January 31, 2019, and due March 2, 2019 (PX1431 (the
        "January Invoice"));

    (2) Number 1111626 for $88,270.75, invoiced on March 29,
        2019, and due April 28, 2019 (PX1433 (the "March
        Invoice")); and

    (3) Number 1112807 for $5,527.61, invoiced on May 31, 2019,
        and due June 30, 2019 (PX1434) (the "May Invoice")).

McKenney's November 2018 invoice was the last one paid by
Leebcor. PX1311 at 1; Tr. at 152. Leebcor concedes that the
amounts billed in the Invoices were for base contract work and
approved change orders, but asserts that it is entitled to
withhold payment due to McKenney's breaches of the Subcontract.
See Tr. at 992-93, 995.

**A. Relevant Timeline**

From January 21 through January 23, 2019, Trentini and
Mileski discussed completed tasks McKenney's could include in
the January Invoice without objection from Leebcor. PX1090. On

January 21, 2019, Mileski explained that he and Trentini "were in agreement," and that McKenney's could process its January Invoice. PX1090. However, his agreement was apparently contingent on Trenini's "confirm[ation]" of certain stipulations. Id. He explained that McKenney's was approved and able to bill $27,493.00 in change order work, that about $6,800 worth of change-order work could be billed later, and that McKenney's must "agree[] that" two change order proposals (15 and 16) concerning costs McKenney's allegedly incurred due to the Initial Delay were "invalid and [would] not be paid or pursued further." Id.

Trentini responded on January 23, 2019. He noted that McKenney's would "not pursue" its change orders related to the Initial Delay as long as it received the compensation it requested through the forthcoming Initial Delay Modification. Id. Trentini explained that if its claim was not approved, "McKenney's reserves the right to pursue schedule delay claims," including those at issue in Change Order Proposals 15 and 16. Id.

On February 1, 2019, when Trentini learned that there was still some apparent confusion between Leebcor and McKenney's employees concerning the status of tasks billed in the January Invoice, Trentini contacted Mileski again. PX1113. The body of the email read as follows: "Hey can you comment on the status of

29

our discussions? I was under the impression that we were on he [sic] same page. Please let me know your thoughts." Id. When Mileski did not respond to this request, Trentini emailed him again on February 25, 2019. Id. In this email, he explained as follows:

> There is still confusion over the status of the [McKenney's] change orders as you and I agreed in January. Can you clarify the agreement we made is still correct and valid? [Van Schoyck] is hearing from your team that you and I have not yet agreed and therefore paperwork and payments of invoices are not forthcoming. We are again in the situation where we cannot bill for the work we have agreed with you on and completed because we do not have change order paperwork from your team. I need your help to clarify the situation to your team so we can move payments forward. Please let me know if there are other concerns related to these changes that we need to address, I am available to have these conversations again if that is required but would like to do it soon if that is the case. Please let me know your thoughts on how best to resolve this.
>
> I would also like to understand the status of the general conditions claim with the government for the delays to the project at the beginning. Can you update me on where the conversations are related to this issue?

Id.

For weeks, Mileski did not respond to Trentini's initial request for information concerning payment of the January Invoice. Tr. at 154-56. On March 1, 2019, Trentini emailed Mileski a third time, once again asking if the pair could "have a discussion about [the payment issues] soon?" PX1126. Mileski responded the same day, explained that he had "advised [his]

30

team" that Leebcor would pay the amounts included in the January
Invoice, and provided several "caveats and critical
information." PX1125. He stated that McKenney's work had been
deficient in multiple ways, and "it appears McKenney's has and
is causing [critical path] delays to [the Project] that could
amount to 10-12 weeks." Id. Mileski concluded the message by
advising that if McKenney's would not timely complete its work,
"Leebcor [was] prepared to handle all remaining issues with 3rd
party contractors and send notice to McKenney's and [its] bond
company of [the] continued quality issues and non-compliance
items to [the Subcontract]." Id. Trentini described Mileski's
March 1 email as the first explanation McKenney's received for
why Leebcor was withholding payment on the January Invoice. Tr.
at 152.

On May 9, 2019, Trentini emailed Mileski again, explaining
that McKenney's had "not received payment since [its] November
2018 invoice and the project [was] . . . complete." PX1225. He
asked "why [McKenney's] payments [were] being held and or when
[it could] expect to receive payments." Id. Mileski responded on
May 13, noting that it was withholding payment due to McKenney's
refusal to give up its Initial Delay change orders, as well as
alleged delays and deficiencies in its work. Id. He explained:

> once [the] latest [TAB and commissioning] delays have
> ended, we can certainly compile the information and
> sit down for a review between our companies. As these
> impacts could be significant, and we have paid you to
> date approximately 98% of your contract, we will need
> to hold the remaining balance to [sic] these issues
> are resolved by both companies.

Id. Trentini responded on May 14 by requesting to meet with Mileski. Id. Ultimately, the meeting never occurred.

In an August 8, 2019, email to USACE Contracting Officer Amy Vaughan, Trentini explained that McKenney's still had not been paid for the work it completed from December 2018 through the Project's conclusion in May 2019. PX1282 at 3. Vaughan forwarded this message to Mileski, and noted that "McKenney's did not receive payment of $159,988.14 as reflected on PE28." Id. She asked that Mileski "look into this," and stated that to her knowledge, "there [weren't] any outstanding mechanical issues hanging out there on [Building 3105]." Id. Mileski responded to Vaughan on September 4, 2019. Id. at 2. He stated that "McKenney's is correct in that we are withholding approximately $ 253,000.00, on their $ 10.0M plus contract, due to McKenney's contractual noncompliance," and identified a couple examples of alleged deficiencies Id.

Leebcor has received payment of the full sum of the Invoices from the Government. Leebcor Corp. Rep. Dep. at 94-96. McKenney's never stopped performing its Subcontract duties despite Leebcor's nonpayment.

## B. Analysis

As discussed in greater detail elsewhere in this Opinion and Order, the court finds that Leebcor's concerns with McKenney's timeliness and work quality were well-founded. However, nothing in the Subcontract or applicable regulations gave Leebcor the right to withhold the amounts billed in the Invoices throughout this litigation.

Section 5 of the Subcontract affords both parties important safeguards. On the one hand, Leebcor's payment obligation is "contingent upon [its] acceptance of" McKenney's work, and Leebcor may "offset" its payment obligation "by amounts equal to what [McKenney's] owes" Leebcor under the Subcontract. Id. On the other hand, once Leebcor accepts McKenney's work, its obligation to pay accrues, absent a right to offset. See id. In addition, Leebcor may not offset its payment obligation "where there are contractual and/or regulatory restrictions on offsets," or against "payment on amounts owed [Leebcor]" which are subject to "reasonable dispute." Id.

Although the parties dispute many aspects of each other's performance, Leebcor demonstrated that it accepted the work it complained of that was billed in the January and March Invoices no later than April 27, 2019, when the Government acknowledged that Building 3105 was complete. Stip. Facts ¶ 20. The court also concludes that Leebcor demonstrated its acceptance of the work

33

billed in McKenney's January Invoice when Mileski "advised [his] team" that Leebcor would pay the amounts included in it, subject to the "caveats" unrelated to whether Leebcor had accepted the work. PX1125; PX1090. As for the May Invoice, Leebcor never specifically identified a basis for rejection of the work billed.

Specifically, the court finds that the relevant emails sent from January through May 2019 demonstrate that Leebcor was withholding payment on the Invoices based on general claims that McKenney's delayed Project completion and breached the Subcontract, but did not argue that it did not accept the work that McKenney's billed for. See PX1090; PX1125; PX1225; PX1282. Essentially, Leebcor attempted to withhold all of McKenney's outstanding Invoice amounts because it had already paid McKenney's "approximately 98% of [its] contract," and wanted to "hold the remaining balance" until all of the outstanding claims were resolved. See PX1225. However, the Subcontract did not afford Leebcor the right to create a concursus of disputed funds as litigation ensued.

Accordingly, after the times noted above, the amounts billed became "payments owed by" Leebcor under the Subcontract. Subc. § 5. Leebcor was not permitted to offset these amounts with the amounts it alleges it was owed for McKenney's breaches of the Subcontract because, as demonstrated by this extensive

litigation, each allegation was subject to reasonable dispute. See Subc. § 14.

The payment provisions the parties agreed to in the Subcontract contemplated Leebcor timely paying McKenney's for its completed work following acceptance, and then addressing potential disputed amounts later. No Subcontract language gave Leebcor the right to withhold payment for already-completed and accepted work based on these disputes. Accordingly, McKenney's breached the Subcontract by failing to pay McKenney's Invoices, and the court **GRANTS** relief to McKenney's thereon.

### C. Damages

McKenney's is entitled to the following damages for Leebcor's failure to pay its Invoices in violation of the Subcontract terms:

(1) $159,988.14 for the January Invoice, with prejudgment interest accruing as of March 2, 2019;

(2) $88,270.75 for the March Invoice, with prejudgment interest accruing as of April 28, 2019; and

(3) $5,527.61 for the May Invoice, with prejudgment interest accruing as of June 30, 2019.

The Clerk is **DIRECTED** to enter Judgment to this effect.[9]

---

[9] In weighing the equities, the court concludes that an award of prejudgment interest is proper because Leebcor benefitted from both the retention of McKenney's Subcontract balance and the work McKenney's completed during the pendency of this litigation. See infra Part XV.

## VIII. MCKENNEY'S CLAIM FOR DAMAGES CAUSED BY THE INITIAL DELAY

According to McKenney's, Leebcor is liable for $367,005 in damages McKenney's allegedly sustained during the Initial Delay. This sum consists of two components. First, extended performance costs, or the cost of having McKenney's personnel performing the job later than expected. Second, unabsorbed home office overhead costs calculated pursuant to the formula announced in a 1960 decision of the Armed Services Board of Contract Appeals (the "Eichleay formula"). See Eichleay Corporation, ASBCA No. 5183, 60-2 B.C.A. ¶ 2688.

In response, Leebcor first contends that this claim is not ripe for adjudication, as it is still empowered to appeal the Government's decision to pay a portion of its claim for damages related to the Initial Delay. Even if the issue were justiciable, Leebcor submits that McKenney's is not entitled to anything due to it its own breaches of the Subcontract, and at most would be entitled to its pro-rata share of the amount the Government paid it for the Initial Delay: 32.68% of $102,779, or $33,588.18.

### A. Relevant Timeline

The Government issued Leebcor a Notice to Proceed on November 15, 2016. Stip. Facts ¶ 11. At the time, the Project was scheduled to take 650 days to design and build. Id. ¶ 11. Construction on the project was initially scheduled to begin on

36

March 14, 2017. Id. ¶ 12. However, because of a 152-day delay caused by the Government (the "Initial Delay"), construction actually began on August 14, 2017. Id. ¶¶ 13-14.

Though it had planned to begin its mobilization in early April 2017, as of June 13, 2017, McKenney's had not yet mobilized to the Project because of the Initial Delay. Tr. at 111-12. Although McKenney's knew that the Project's start date had been delayed, Leebcor did not advise McKenney's how long the delay would be. Tr. at 112. During the Initial Delay, McKenney's was also working on a different construction project at Fort Benning, known as Building 3305. Tr. at 635.

McKenney's had not received a schedule with the correct start date for the Project by early September 2017. Tr. at 115-16. McKenney's received the first schedule with the correct construction start date - August 14, 2017 - on September 21, 2017. Tr. at 119-120; DX1462. The schedule was referred to by Leebcor and McKenney's as "BL-10" (PX1267 at MCK_0038633-MCK_0038696). That day, Reid Wolfe provided BL-10 to Jonathan Reeves by email as an attachment. DX1462. Wolfe also explained that BL-10 would "be updated to reflect the 2 week furniture delay shortly," and that he would "send out the revised schedule when completed by [Leebcor's] scheduler." Id. BL-11 ultimately became the operative Project schedule. Tr. at 1518-19 (Van Schoyck testimony explaining that BL-11 was the baseline

37

schedule that Leebcor provided to McKenney's and basing testimony concerning sequencing on that schedule).

To seek compensation for additional costs incurred due to the Initial Delay, Leebcor prepared and submitted a request for equitable adjustment in response to the Government's request for proposal on behalf of itself and multiple subcontractors, which was subsequently revised. Stip. Facts ¶ 15; DX 22 (revised request for $1,943,623.46 on August 3, 2018). Ultimately, Leebcor sought a total of $1,943,623.46, $640,736.41 of which were for "Direct Subcontractor Costs." DX22. McKenney's was among the four (4) subcontractors who submitted supporting documentation to Leebcor concerning the additional costs it incurred, which Leebcor included in the request to the Government. See Stip. Facts ¶ 15; DX22. In all, McKenney's submitted supporting documentation for certified costs of $102,779. DX22; Tr. at 309. At the time he provided it in June 2018, Trentini certified and affirmed under oath that the claim was "complete and accurate," as memorialized in the document. See DX22; DX43.[10]

On May 26, 2020, roughly a year after the Project was completed, and roughly three (3) weeks after McKenney's filed its Complaint, the Government responded to Leebcor's request for

---

[10] McKenney's also submitted this documentation to Leebcor, without an affidavit, in a May 2018 email in support of Change Order Proposal 1. See PX734.

equitable adjustment by issuing a unilateral modification to the Prime Contract related to the Initial Delay ("Initial Delay Modification"). <u>See</u> Stip. Facts ¶ 16. The Initial Delay Modification only awarded Leebcor $635,149.50 of the $1,943,623.46 it requested - roughly 32.68 % of the total amount - and increased the contract duration by 152 days. <u>See</u> DX17. The Government did not specify how the additional funds were to be divided among Leebcor and the four (4) subcontractors who submitted evidence of damages related to the Initial Delay in the request for equitable adjustment. <u>See</u> <u>id.</u> In its Complaint, McKenney's identified "costs of $102,779" related to the Initial Delay - the same amount of costs it certified as correct for Leebcor's initial submission to the Government. See Compl. ¶¶ 22-24; DX22; PX734.

But in April 2021, after litigation was well underway, McKenney's sent Leebcor a letter reading as follows:

> In connection with McKenney's Expert Disclosures and the quantification of damages therein, where applicable, I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which McKenney's believes it is entitled; and that I am duly authorized to certify the claim on behalf of McKenney's.
>
> This certification is in addition to the prior certification McKenney's has submitted in regard to its claims regarding the Fort Benning Starship Barracks Project.

PX1473 (letter from Trentini to Zervakis). Attached to the letter was an expert report prepared by Glen Stevens, McKenney's damages expert, for this litigation, claiming that McKenney's was entitled to $367,005 for the initial delay, and explaining the support for this figure. See Tr. at 697, 920-21. The attached report also included McKenney's damages calculations for its other claims in this litigation. See Tr. at 920-21. The substantial increase in McKenney's Initial Delay claim was largely due to the addition of unabsorbed home office overhead expenses calculated pursuant to the Eichleay formula, which McKenney's submits it did not know about when it submitted its initial certification for Initial Delay damages. See Tr. at 135.

Although its initial certification of costs of $102,779 included a sworn affidavit, this letter did not. Compare PX1473 (letter), with DX22 (McKenney's initial certification). McKenney's was aware that the absence of such an affidavit could delay the Government dispute resolution process, as Leebcor previously notified McKenney's and other subcontractors that it would need affidavits to support its request for equitable adjustment to the Prime Contract for Initial Delay expenses. See DX43. On top of this issue, the letter also did not make clear that McKenney's intended to withdraw or supersede its earlier certification relating to Initial Delay damages, or even that the letter was intended to support Leebcor's administrative

40

appeal of the Government's Initial Delay Modification. PX1473 (explaining that the letter was "in addition to" earlier certifications).

Around August 2021, Leebcor requested that McKenney's execute an affidavit certifying its new Initial Delay claim amount, in order to clarify the damages McKenney's was seeking before Leebcor appealed the Government's unilateral Initial Delay Modification. See Tr. at 921, 1004-05. Mileski credibly testified that Leebcor felt that the April letter was not a sufficient certification to use for its appeal to the Government, and that it did not understand the letter to be used for submittal to the Government. Tr. at 918, 920-21, 924. He explained that Leebcor "thought [the letter] was just a certification of damages for the expert report amounts" and not a certification for use in any administrative appeal. See Tr. at 920-21. This is why Leebcor notified McKenney's that it was "officially appealing the decision of the government, and [needed McKenney's] to let [Leebcor] know whether [it] want[ed] to stick to [the] $102,000 original claim and certification or," instead, wanted "to change it," and that if McKenney's "want[ed] to change it, [Leebcor] need[ed] the documentation that supports that." Tr. at 921. In Leebcor's view, the letter did not satisfy the certification requirement established by the Subcontract, which incorporated the Contract Disputes Act certification

41

requirements. See Tr. at 924; Subc. § 14 (referencing the Contract Disputes Act).

The testimony of Trentini, the project executive familiar with McKenney's stance on the Initial Delay claim, was that he was uncertain as to the intended effect and purpose of this letter. See Tr. at 312. When asked at trial whether the letter "was intended to support a submission of the dollar amounts calculated in Mr. Stevens' expert report with regard to the initial project delay for submission to the government," Trentini was unsure. Tr. at 312. He stated: "I think it was . . . in connection with the expert disclosures, I don't know what the submission to the government part means. We have no idea what - how Leebcor pursued that claim with the government. We were not informed." Tr. at 312.

Nevertheless, Mileski explained at trial that "McKenney's can submit whatever documents they choose to submit as long as they certify [them], and [Leebcor is] happy to submit [them] to the government for the final government review and decision related to [the Initial Delay], . . . ." Tr. at 926. In the same vein, on cross examination, Mileski stated the following: "The good thing is, . . . we can still submit this appeal today or tomorrow if [Leebcor] get[s] the proper certification that there is a misunderstanding between McKenney's and Leebcor, we still have time to get the proper information, and McKenney's wants

42

represented, we can get the proper certification, and we can still submit that claim to the government tomorrow or as soon as we get information to hopefully to get Leebcor and McKenney's interest done and resolved" as it relates to the Initial Delay. See Tr. at 1006.[11]

### B. Analysis

#### 1. The Initial Delay Modification did not communicate a final decision concerning McKenney's share of Initial Delay damages.

The Subcontract provides that "[u]nless the amount of [the Subcontract] is modified in writing by mutual agreement of the parties, [Leebcor] is not obligated to compensate [McKenney's] beyond the stated amount." Subc. § 3. However, the agreement also provides that if certain "acts by [Leebcor] alter the current start dates, end dates, durations and planned sequences for the Work set forth in the Published Project Schedule attached to [the Subcontract], [McKenney's] fixed-price and period of performance for the Work shall be adjusted to the extent they are impacted by such action." Id. Ex. 1, § D.

As discussed above, Leebcor sought and received a contract modification, awarding Leebcor additional money for completing the Project, to compensate Leebcor and its Subcontractors. This implicates Section 14 of the Subcontract, which provides that

---

[11] To date, the court has no information that McKenney's has ever submitted this "proper certification" to Leebcor for submission to the Government. See infra Part VIII.B.2.

Government decisions relating to both the Prime Contract and the Subcontract are binding upon McKenney's if (1) McKenney's was "allowed to provide any required or supporting documentation in the basis of the [the Government's] decision," and (2) the decision is "binding upon [Leebcor] under the Prime Contract . . . ." Subc. § 14 (underlining in original).

McKenney's was allowed to provide supporting documentation relating to its Initial Delay claim for submission to the Government, and the Initial Delay Modification related to both the Prime Contract and the Subcontract. However, the parties agree that nothing in the Initial Delay Modification instructed how the $635,149.50 upward adjustment to the Prime Contract price was to be allotted among Leebcor and the four (4) subcontractors who sought recompense for the Initial Delay expenses they incurred. Assuming that the decision is "binding upon" Leebcor despite its ability to appeal the decision, that finality would not preclude McKenney's from pursuing its Initial Delay claim.

Although the evidence does not demonstrate that the Government intended to award McKenney's a substantially larger pro rata share of its damages than the other entities, there is also no support for Leebcor's asserted pro-rata cap. McKenney's claim of $367,005, the amount it seeks in this litigation, Tr. at 697, is for a sum far less than the $635,149.50 awarded in

44

the Initial Delay Modification. And the Government's determination that this figure is the amount Leebcor and its subcontractors are entitled to for the Initial Delay is the only "decision" announced in the Government's modification. Therefore, at most, the modification would prevent McKenney's from seeking more than $635,149.50 from Leebcor for its Initial Delay claim. However, McKenney's seeks far less than that at this juncture.

Accordingly, Section 14 of the Subcontract does not expressly bar McKenney's from raising its argument. This is because the unilateral Initial Delay Modification — as it currently stands — says nothing about how much money McKenney's is entitled to, and McKenney's seeks far less than the Government awarded for the Initial Delay. Still, for the reasons explained next, the current posture of the administrative process renders the Initial Delay claim inappropriate for adjudication.

## 2. McKenney's Initial Delay claim is not prudentially ripe.

"Ripeness reflects constitutional considerations that implicate 'Article III limitations on judicial power,' as well as 'prudential reasons for refusing to exercise jurisdiction.'" Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 671 n.3 (2010) (quoting Reno v. Cath. Soc. Servs., Inc., 509 U.S. 43, 57, n.18 (1993)). To assess whether a claim is ripe for

45

adjudication, "courts must balance the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Franks v. Ross, 313 F.3d 184, 194 (4th Cir. 2002) (quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998) (quoting Abbott Labs. V. Gardner, 387 U.S. 136, 149 (1967)) (internal quotation marks omitted)).

Indicators of ripeness include when the issue in question is "'purely legal, and will not be clarified by further factual development,'" and where "denying prompt judicial review would impose a substantial hardship" on the claimant. See Susan B. Anthonly List v. Driehaus, 573 U.S. 149, 167-68 (2014) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985)). However, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas, 473 U.S. at 580-81 (internal quotation marks omitted)).

McKenney's has satisfied the Article III aspect of the ripeness requirement because there is clearly a live dispute between the parties concerning a concrete, particularized injury Leebcor allegedly caused McKenney's: money damages caused by Leebcor's nonpayment of expenses incurred during the Initial Delay. See Simmonds v. I.N.S., 326 F.3d 351, 357 (2d. Cir. 2003) (describing this aspect as a limitation "prevent[ing] courts

46

from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it"). As the court has jurisdiction over the issue, only a substantial showing that intervening now would be inappropriate will suffice to overcome the "virtually unflagging" obligation of the court "to hear and decide cases within its jurisdiction." See Susan B. Anthony List, 573 U.S. at 167 (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 126 (2014) (cleaned up)). With this duty in mind, the evidence received at trial leaves the court assured that this claim is not prudentially ripe for review.

The court first assumes that McKenney's will experience some degree of hardship by delaying adjudication. Without deciding McKenney's entitlement to its Initial Delay damages under the Subcontract, for the purposes of this analysis the court assumes that McKenney's has suffered financial loss caused by the Initial Delay. It also assumes that the damages incurred are recoverable under the Subcontract. Thus, the court assumes that McKenney's is currently left without compensation for expenses it incurred and is entitled to under the Subcontract. This of course favors reaching the merits of the claim now.

However, any hardship was, at least in part, the product of McKenney's own decision not to clarify its damages certification. The Subcontract required McKenney's to certify

47

its damages in accordance with the Contract Disputes Act. The regulations implementing the Act require the certification to state as follows:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor

48 C.F.R. § 33.207(c). There is no requirement that the certification include an affidavit. While Trentini's April letter may have technically satisfied the certification requirement established by this regulation, certain information was lacking when considered in the context of what had previously been submitted and what Leebcor requested.

Basically, whether or not the letter constituted an adequate certification under the CDA and related regulations is really beside the point, as it must be considered in light of the other documents McKenney's provided Leebcor concerning the Initial Delay. Properly contextualized, McKenney's failure to respond to Leebcor's inquiries by clarifying (1) the amount it sought from the Government, (2) whether it intended to withdraw its prior certification, and (3) whether the April 2021 letter was for use in the administrative proceedings in addition to the ongoing litigation, was collectively unjustified and unreasonable.

48

It was entirely appropriate for Leebcor to question whether the April 2021 letter was intended to also serve as the basis for an administrative appeal where the letter was silent on the issue and the litigation was ongoing. The letter was accompanied by an expert report prepared in discovery for the ongoing litigation and alleged roughly three times the damages initially sought, which damages were previously certified as "complete and accurate." DX22. Trentini's apparent confusion concerning the purpose of the April 2021 letter illustrates the reasonableness of Leebcor's position. See Tr. at 312. Leebcor had a vested interest in ensuring that the documentation it submitted to the Government afforded it, and its subcontractors, the best chance of full compensation from the Government for additional costs incurred during the Initial Delay. Submitting conflicting "certified" damages amounts for the same alleged injury would surely confuse the contracting officer reviewing the unilateral decision. See 48 C.F.R. § 33.211(d) (providing that the contracting officer should take into account "[t]he adequacy of the contractor's supporting data" when making a decision).

Finally, and more importantly, the parties' decision to be bound by a final administrative decision concerning the Initial Delay weighs against reaching the merits of the Initial Delay claim. See Subc. § 14. Section 14 of the Subcontract will ultimately require McKenney's to yield to an administrative

determination of its Initial Delay damages. Under the regulations implementing the CDA, Leebcor may appeal the Initial Delay Modification within six (6) years of the "accrual of [its] claim" by seeking a contracting officer's final decision. 48 C.F.R. § 33.206 (establishing six (6) year limit). It may then appeal that decision to the Armed Services Board of Contract Appeals, and, finally, to the Federal Circuit. See 41 U.S.C. §§ 7104-7105, 7107. As discussed above, Leebcor has represented, under oath, that it will appeal the Government's unilateral Initial Delay modification, and that McKenney's can still submit supporting documentation for its recently increased claim so that it can be considered on appeal. The delay at this juncture is McKenney's, not Leebcor's or the Government's.

Under the Subcontract, any decision on appeal that specifically allocates the amount of money Leebcor and its subcontractors should receive would be binding on all parties. See Subc. § 14. Although the Initial Delay modification does not currently identify how the awarded funds are to be apportioned, the administrative process will almost certainly address the question, as the Government will have to explain why it chose to pay certain claims through the Initial Delay Modification and refused to pay others.

If the court were to decide McKenney's Initial Delay claim now, there is a very substantial likelihood that the court's

decision will be inconsistent with the ultimate result of the administrative process. Whether any discrepancy ultimately cuts for or against McKenney's, it would place the parties' obligations under the Subcontract squarely in tension with a judgment of this court. Intervening now, therefore, would potentially void the dispute resolution terms the parties agreed to in Section 14 of the Subcontract.

Finally, deciding the issue now would effectively require the court to choose which subcontractors who submitted supporting documentation relating to Initial Delay damages should be compensated, and which should not. There is currently no reasoned basis for making this determination. However, further factual development through the administrative process will provide it.

For these reasons, the court concludes that the lack of "fitness of the issue[] for judicial decision" outweighs any "hardship to the parties of withholding court consideration." See Franks, 313 F.3d at 194 (quoting Ohio Forestry Ass'n, 523 U.S. at 733 (internal quotation marks omitted)). McKenney's claim for damages relating to the Initial Delay is therefore **DISMISSED** as prudentially unripe.

## IX. MCKENNEY'S CONSTRUCTION DELAY CLAIM

McKenney's seeks $544,493 in damages stemming from delays allegedly caused by Leebcor and its other subcontractors once

construction began. It argues that these delays prevented it from substantially completing its scope of work on the Project by August 31, 2018, as planned, until January 17, 2019, including 139 days of delay attributable to Leebcor and its other Subcontractors. See Tr. at 697, 799. However, because McKenney's own conduct delayed its completion of its scope of work, and because McKenney's failed to adequately distinguish periods of alleged Leebcor-caused delay from delay caused by its own conduct, this claim must fail.

## A. Quality Control Problems

McKenney's consistently failed to adhere to the Subcontract's requirements concerning duct cleanliness, material management, and job site storage, and these failures repeatedly delayed McKenney's work and successor work.

### 1. Relevant Requirements

The Subcontract incorporates by reference the Detailed Scope of Work attached to it as Exhibit 1. Subc. ¶ 1 (incorporating Ex. 1). Relevant here, the Scope of Work required McKenney's to complete its work "in accordance with the Contract Documents, Plans, and Specifications." Id. Ex. 1, § A.

The Specifications[12] required McKenney's to:

---

[12] Neither party introduced the actual Specifications document at trial. However, McKenney's already admitted at summary judgment that the listed specifications were included in the document. See ECF No. 123 at 9.

- "[p]rotect stored equipment at the jobsite from the weather, humidity and temperature variations, dirt and dust, or other contaminants," Specifications § 23 00 00 (1.5 Delivery, Storage, and Handling);

- "cap or plug all pipes until installed," id.;

- "prevent the accumulation of dust, debris and foreign material during construction, perform temporary dust control protection," Specifications § 23 00 00 (3.3.6. Dust Control);

- "[p]rotect the distribution system (supply and return) with temporary seal-offs at all inlets and outlets at the end of each day's work," id.;

- "[k]eep temporary protection in place until system is ready for start[-]up," id.;

- "[t]horoughly clean surfaces of piping and equipment that have become covered with dirt, plaster, or other material during handling and construction before such surfaces are prepared for final finish painting or are enclosed within the building structure," Specifications § 23 00 00 (3.6 Cleaning);

- "[b]efore final acceptance, clean indoor mechanical equipment, including piping, ducting, and fixtures, and [keep them] free from dirt, grease, and finger marks," id.;

- "[w]ipe equipment clean, with no traces of oil, dust, dirt, or paint spots" and "[m]aintain system in this clean condition until final acceptance," Specifications § 23 00 00 (3.9 Cleaning and Adjusting); and

- "[p]rotect open ducting from construction dust and debris in a manner approved by the Contracting Officer," Specifications § 23 31 13.00 40 (3.2.2.1 Ductwork Cleaning Provisions).

The Detailed Scope of Work also required Mckenney's to

- "prevent exposure of building systems to environmental tobacco smoke during construction by not allowing

53

smoking in enclosed portions of the project site, and not allowing smoking adjacent to fresh air intakes or the building," Subc. Ex. 1, § C, ¶ 16;

- "provide protection of all ventilation system components during construction," id.; and

- "provide instruction to workers on appropriate procedures and methods for managing and maintaining indoor air quality at the appropriate stages of the project," id.

## 2. Recurrent Failures

### a. October 2017

McKenney's was first alerted to problems with its ductwork installation in October 2017, very early in the construction process. PX391. In an October 20 email, Van Schoyck conceded that McKenney's "may not be in compliance" with the specification section requiring McKenney's to protect open ducting in a manner approved by the USACE contracting officer. Id.; Tr. at 564. He asked that Leebcor "help [McKenney's] by discussing this with [the USACE] to get [it] to approve" its ductwork protection method. See PX391. Specifically, McKenney's planned to deliver ductwork to the project in an enclosed trailer (without plastic covering on the open ends of the ducts), pile it at the job site, and wrap the pile with plastic. See id.; Tr. at 227-228, 389.

Zervakis responded on October 23, 2017, stating as follows:

McKenney's is responsible for installing clean ductwork and taking the necessary precautions to keep

54

> installed ductwork clean through construction by those
> means approved by the Contracting Officer.
>
> We are here to work together and find fair and
> reasonable solutions to conflicts such as this but the
> most important voice is that of the Government. We
> will relay the USACE response as soon as it is
> received.

Id.[13]

Brian Cowart's response to this message On October 23 was to email Van Schoyck a single word observation: "Whatever". DX1227. Van Schocyk responded to Cowart the same day as follows: "Words words words more words . . . . . you're right but I'm going to act all big and bad . . . . words words words." Id. Cowart quickly replied that "Blake [McKenney's sheet metal foreman] better be vigilant because [Leebcor's] tooty hurts right now[.]" Id.[14] Van Schoyck's next response was that he "already told [Blake] he had BETTER be covering things constantly because the FIRST pile of duct they find that isn't covered they're gonna [be] gunning for a white glove test." Id.

---

[13] Zervakis credibly testified that ductwork cleanliness was a recurrent issue that had to be repeatedly addressed with McKenney's during the project. Tr. at 1039. Indeed, he described the issue as "continuous." Tr. at 1042.

[14] Van Schoyck attempted to cast this statement in a more positive light, testifying that he "took [it] to mean that Blake . . . should be aware of how the duct delivery happens so that [McKenney's] could make sure that [it was] complying with what [it was] being asked to comply with." Tr. at 566. As the rest of this conversation makes clear, however, McKenney's response was more dismissive than indicative of an eagerness to address Leebcor's concerns.

(capitalization in original). Read together, this correspondence demonstrates that very early on in its work, McKenney's shrugged off Leebcor's attempts to maintain the quality control standards required by the USACE and construction documents.[15]

Despite McKenney's dismissiveness, issues with its ductwork caught the Government's attention the next day. On October 24, 2017, Tony Pickett, a USACE quality assurance representative, conducted a walkthrough of the Project along with multiple Leebcor and McKenney's employees, including Wolfe and Van Schoyck. DX51; Tr. at 570. Wolfe relayed the multiple issues Pickett identified, as well as a recitation of several of the Specifications relating to ductwork protection, to Van Schoyck by email on October 24. Id. He explained that Pickett stated the following:

(1) McKenney's ductwork "need[ed] to be clean and sealed from the time it le[ft] the fabrication shop until installation";

(2) that the "ductwork that is installed needs to be cleaned of all dirt and debris," and that he observed a "good amount of metal shavings along with dirt" inside installed duct;

(3) that some of the duct stored on site had "oil on the ends" which "captures dirt";

(4) "there shall be no more dirty duct installed";

---

[15] This response is striking considering McKenney's responsibility for installing the air handling system on a multimillion-dollar, taxpayer-funded Project, in a building that would house members of our armed forces.

    (5)    that he observed a "run of ductwork" that "was installed
           and was not level," which "need[ed] to be corrected"
           because the "ductwork should be level."

DX51. Zervakis's email included pictures of several of the

issues noted. Id. Figure 2, as appears below, is one of those

pictures.



Figure 2 – An example of one of the images attached to the October 24 email
showing metal shavings in installed ductwork. DX226 at LEEB_000196459 (color
version of image in DX51 at MCK_0080636).

    A little after 1:00 P.M. on October 24, 2017, the USACE

shut down McKenney's ductwork installation for "cause" due to

ductwork cleanliness issues. DX226 at LEEB_000196487. The reason

for the shutdown was "quality control issues brought up by USACE and the Leebcor Project Team," and the shutdown "applie[d] only to the Ductwork Installation." Id. This shutdown, caused by McKenney's failure to adhere to the Subcontract requirements, delayed McKenney's work.

### b. November 2017

The next month, Leebcor once again contacted McKenney's to address ductwork quality control concerns. In a November 29, 2017, email, Dickerson explained to Van Schoyck that he performed a walk through and noted portions of ductwork hangers that were not sealed in accordance with Government's instructions,[16] "holes [in duct] not sealed, holes in the sealant (possibly from shrinkage)," as well as "some duct rolling to one side." DX 841. He asked that in the future, he could have a walk-through with McKenney's sheet metal foreman after McKenney's felt like it had "finished running the duct work before [it] move[d] on so if [Leebcor] [had] any issues" the two companies could "button them up" before McKenney's workers moved on. Id.[17] Dickerson credibly testified that he passed these

---

[16] The specific Government representative was Tony Pickett, a Quality Assurance employee with the USACE. Tr. at 1295-96.

[17] Van Schoyck suggested that McKenney's had not told Leebcor it was complete in the areas at issue. See Tr. at 583-84. However, the context of the email and Dickerson's testimony make clear that McKenney's workers had moved on from this area, and that they left these issues behind. The court

concerns onto McKenney's because the Government told him that the issues "needed to be fixed" and "because there was a concern that air would blow out of that hole . . . as the air was traveling through the duct." Tr. at 1297; see infra Figure 3 at 59.



Figure 3 - One of the images attached to the November 29 email depicting installed ductwork with two small holes in it. DX841 at LEEB_000360282.

### c. January 2018

On January 26, 2018, Dickerson contacted Van Schoyck by email to express concern regarding McKenney's work. PX522. He

recognizes, however, that McKenney's own quality control personnel could have caught the issues at some point.

explained that he observed several issues related to McKenney's work the day prior, including the following:

- "uncapped and uncovered PVC pipe" that he had previously brought to McKenney's attention;

- "gas piping under [the Company D covered training area] that is uncapped and not covered";

- "chiller pipe that is rusted, ends uncapped up in the air";

- "duct work that could be considered stacked, but not in a manner to protect it from becoming damaged"; and

- "dents in the HVAC duct in D company 2nd floor" which was "still hung with no remediation prior to installation."

PX522 at 4. Several images were attached to this message. DX548; Tr. at 1301-02; see infra Figures 4, 5, and 6 at 60-61.



Figure 4 - Image attached to the January 26 email showing rusted pipe. DX548 at LEEB_000286736.



Figure 5 - Image attached to the January 26 email showing haphazardly stacked ductwork. DX548 at LEEB_000286745. As Dickerson explained, "[a] lot of this ductwork had dents in it, and when we install the ductwork, you can't have large dents in it, and this was just not . . . stored in a manner that will protect it." Tr. at 1309. The court agrees.



Figure 6 - Image attached to the January 26 email showing installed but uncapped pipe. DX548 at LEEB_000286748. Dickerson described this as "either chiller piping or gas piping hung in the air that is not capped on the ends," an issue that "was specifically discussed." Tr. at 1310. When pipes are unsealed "air or humidity or moisture" can get inside the pipe, which can cause the inside of the pipe to rust. Tr. at 1312.

Van Schoyck sent Dickerson an email responding to Dickerson's concerns. He explained that the PVC pipe at issue "was covered before [he] left" the job site the day prior. PX522 at 2. In reference to the uncapped pipe, Van Schoyck also explained that McKenney's would "make sure [to] walk down [its] systems as [it] install[ed] them and ensure ends of pipe are covered." Id. He responded to the rusted chiller pipe issue by noting that the pipe "will be insulated (at which point the installation instructions for the insulation system will be followed[)]," apparently suggesting that the rust would not be an issue because the pipes would be covered with insulation. See id. at 2-3.[18] As for the gas pipe, he similarly noted that it was "to be painted (by Leebcor) once installed, so as soon as it is tested, [Leebcor] can get [its] painter to paint it which will protect further against rust." Id. at 3. Once again, the

_____

[18] When explaining the "rusted pipes" issue at trial, Van Schoyck testified that

> [i]t is very common with carbon steel piping that if the piping is exposed to the elements, such as a building that has not been closed it, that it will develop surface rust. The piping was fabricated or delivered to the site in the manner consistent with the specifications and the submittals.

Tr. at 589. However, McKenney's was required to "[p]rotect stored equipment at the jobsite from the weather, humidity and temperature variations," even after it was delivered. See ECF No. 123 at 9 (quoting Specifications § 23 00 00 (1.5 Delivery, Storage, and Handling)).

suggestion is that once the rust is covered up, this time with paint, it would not be a problem. This incorrect assertion distracts from the real issue – McKenney's failure to comply with the material protection provisions of the Specifications that allowed the pipes to get rusty.[19] In regard to the dented duct, Van Schoyck responded that McKenney's would "pull the large dents out," and that the majority of the dented ductwork had been replaced. Id.

James Clark, Leebcor's Quality Control Manager who had been copied on these messages, intervened on January 26, 2018, apparently finding Van Schoyck's responses unsatisfactory. Id. at 1-2. He replied to the chilled water piping issue as follows:

> [McKenney's is] to deliver and use the material that was submitted and approved. You [sic] submittal shows the piping factory coated and no rust. Leebcor and USACE is not paying for material that has been damaged because you did not store your material properly. The materials do not meet spec and submittals and will be repaired to a new state or replaced.

PX522 at 3.

---

[19] As Dickerson explained, only "exposed gas line" would be painted, and the "majority of this gas line, well over 90 percent, was above the ceiling. You don't have to paint gas lines above the ceiling in areas that are not exposed." Tr. at 1363. In any event, Leebcor "would have had to give [its painter] a change order to prepare [the] pipe [at issue] to be painted" because "[y]ou can't just paint over the rust." Id. Instead, the painter "would have to come in and expend additional labor to remove [the] rust prior to painting. The issue was that it was too rusty to even be painted." Id. In any event, it was McKenney's responsibility to ensure that the pipes it installed were clean and ready for finish paint. See supra Part IX.A.1. (Specifications § 23 00 00 (3.6 Cleaning)).

As for the rusted gas pipe, he contended that Van Schoyck was "incorrect" and that it "**is not the responsibility of other trades to repair McKenney's material and mistakes.**" <u>Id.</u> (bolding in original). He directed that McKenney's "deliver and use the material that was submitted and approved," which was "piping factory coated and no rust." <u>Id.</u> He stated that "Leebcor and USACE is not paying for material that has been damaged because [McKenney's] did not store or handle [its] material properly." <u>Id.</u>

He similarly instructed that the "duct work . . . not be hammered out," explaining that McKenney's submittal showed "the Metal Duct in new condition NO DENTS. Leebcor and USACE is not paying for material that has been damaged because [McKenney's] did not store [its] material properly." <u>Id.</u> (capitalization in original). He explained that the duct "cannot be cut and pieced back together the damaged section will be replaced." <u>Id.</u>

In addition to these responses, he also stated that

> [d]ue to the continuous difficulty [McKenney's] is having with understanding the specs and Quality control Practices ( like me showing you Duct that was damaged and instructing you to have it replaced prior to hanging and you said nothing to your men and let them hang it) [McKenney's] Must attend a follow up preparatory before resuming any work in your contract. We will have a preparatory for plumbing and Gas at 9 am on Monday and a Preparatory for HVAC at 10 am. This is mandatory!

64

Id. at 1-2. Van Schoyck testified that he did "not remember the example or what [Clark was] talking about," in regard to hanging damaged duct, but said it "could have been some of the vents that were later corrected." Tr. at 594.

In sum, following a back-and-forth discussion concerning McKenney's failure to adhere to the Subcontract requirements, Leebcor stopped McKenney's work to address the continuing quality control issues.[20]

### d. February 2018

On February 16, 2018, Dickerson once again emailed Van Schoyck expressing concern regarding ductwork cleanliness, and included several images documenting his concerns. DX50. His message to Van Schoyck read as follows:

> As discussed on multiple occasions, we need to ensure we are protecting our stored materials properly. This duct is located in C company on second and third floor. I know the insulators should be cleaning as they go, but this is by far the dirtiest duct I have seen onsite to date. Although it is stored on the floors out of the elements, it should be covered to help limit the exposure to dirt, dust and other debris. Let me know if you have any questions.

Id. Attached were images of ductwork stored on site that was dirty, at least some of which was damaged. Id.; see DX849

---

[20] This episode is also consistent with Dickerson's credible testimony that, as a general matter, "[i]t was always an argument and always a fight" to try to address issues with McKenney's as they arose. Tr. at 1289.

(containing the same images but in color, with one example attached below as Figure 7).



Figure 7 - One of the images attached to the February 16 email showing dirt-covered duct. DX849 at LEEB_000364672.

When questioned about the images, Van Schoyck conceded that at least some portrayed dirty duct. Tr. at 579. When asked about the dented duct, he explained that he did not know how it got damaged. Tr. at 579.

This is yet another example of McKenney's failure to comply with the Government's early instructions to keep the ductwork

clean and undamaged, which McKenney's was also required to do under the Subcontract and Project Specifications with Leebcor.

## B. Plumbing Brackets & Tilework

McKenney's argues that delayed tilework was one of the contributing factors that delayed its own work, specifically, installing bathroom fixtures like toilets and shower liners. See, e.g., PX901. However, the court finds that Zervakis's and Dickerson's credible testimony on the issue belies this argument, and instead demonstrates that McKenney's own deficient performance caused tilework delays. Specifically, the court finds that McKenney's use of improper screws to install plumbing assemblies behind certain walls caused the walls to bulge, and in turn, caused completed tilework to fail. See, e.g., Tr. at 1287-88.

The issue is documented in an August 16, 2018, email from Van Schoyck to Wolfe, with Dickerson copied. PX901. In it, Van Schoyck referenced attached pictures of unfinished and damaged tilework in E Company, floors one and two, that McKenney's "need[ed] . . . finished ASAP as [it] [had] fixtures that [were] sitting around waiting for someone to break them." Id. The image included below was one of the two attached to the message. See infra Figure 8 at 68.



Figure 8 – Image attached to the August 16 email depicting damaged tile in E Company. PX901 at 2.

Van Schoyck described this image as depicting, "on the left," an area "where a countertop should exist for a sink to be placed, and on the right, . . . an in-wall carrier where a toilet goes onto." Tr. at 449. In sum, he noted that "there's several tiles that are missing, and there's no mill work." Tr.

at 449. However, the court concludes that this issue runs much deeper than this cursory statement suggests.

At trial, Zervakis explained that the issue of damaged tilework had been discussed on several occasions by August 2018. Tr. at 1068. Zervakis and others performed a "root cause analysis of why the tile was . . . being removed, and why [the tile subcontractor] could not lay the tile flat on the wall." Tr. at 1069. Leebcor ultimately discovered that "the root cause of the issue was when the drywall was installed to the surface of the existing studs or the new studs for the wall, there had been protrusions between the drywall and the metal studs." Tr. at 1070. He explained that this was caused by an issue with how McKenney's installed plumbing carriages behind the drywall. Tr. at 1070. These carriages were McKenney's responsibility, and were used to hold plumbing fixtures, like sinks and toilets, to the wall. Tr. at 1071-72.

As Dickerson testified, McKenney's used "a copper strap about two and a half, three inches tall that [it] placed across the face of the studs," and "used a pan head screw," which "has a profile the bulges out," rather than a "flathead screw" when it installed certain pipe carriages in the walls. Tr. at 1287. This "pan head screw" caused the sheetrock to bulge when installed over the carriages, and, in turn, caused the tile later installed on the sheetrock to bulge. Tr. at 1287-88. This

69

defect arose "in both the lavatories and the showers where the straps were," and prevented tile from being installed flat on the wall. See Tr. at 1287-88. As a result, Leebcor had to "take the tile down, remove the [s]heetrock, . . . to expose the bracing and try to manipulate" it "in order to reduce the bulge that it was causing," before replacing the sheetrock. Tr. at 1288. Once the sheetrock was replaced, Leebcor had to "do additional mudding and taping" of the sheetrock joints "and then lay the tile back up." Tr. at 1288.

This rework, caused by McKenney's use of the incorrect screws, delayed successor work, such as McKenney's fixture installation. See Tr. at 1088-89.

### C. TAB, Commissioning, and Performance Verification Delays

McKenney's failure to adhere to the Subcontract requirements for its scope of work, and to adequately prepare the systems it installed for the test and balance ("TAB"), performance verification testing ("PVT"), and commissioning phases of the Project, were significant contributing factors to the unusually long duration of those processes. The court takes this issue up in greater detail below, and incorporates those findings here.[21]

---

[21] See infra Part X.A.3.a.

### D. Conflicting Experts

Glen Stevens was McKenney's damages and critical-path delay expert, and Brent Sadauskas filled that role for Leebcor.

Stevens opined that, after construction began, Leebcor caused 139 calendar days of delay to McKenney's substantial completion of its scope of work. Tr. at 753. He explained that delays occurred "throughout calendar year 2018, which result[ed] in McKenney's not completing its work until the middle of January 2019." Tr. at 799. Stevens did not attribute any delays on the Project to McKenney's shortcomings.

Sadauskas opined that 22 days of critical path delay occurred between August 14, 2017, through November 1, 2018, none of which was due to the Structural Steel Delay.[22] Tr. at 1190. Indeed, he opined that "McKenney's was actually a part of that" delay, although he apparently did not find McKenney's to be the sole cause of the critical path delay. Tr. at 1190-91.

Although the court finds that neither expert's assignment of blame for the Project delays is entitled to determinative weight, the court affords the opinion of Sadauskas significantly more weight than that of Stevens. The court does so because the court finds Stevens's opinion that McKenney's quality control problems did not delay the Project is inconsistent with the

---

[22] This was the delay caused by existing structural steel deficiencies in Building 3105 that triggered a Government modification to the Prime Contract. See supra Part V.C.

record and credible evidence/testimony, as described above. The court finds, and the record demonstrates, that McKenney's own shortcomings consistently delayed its work and, in turn, Project completion. See, e.g., DX51; DX841; DX1227; PX522.

### E. Conclusion

Boiled down, McKenney's claim relies on the theory that, but for conduct Leebcor should be held responsible, McKenney's would have been substantially complete with its work 139 days earlier than it actually was. Thus, McKenney's must demonstrate that (1) Leebcor's breach of the Subcontract was "the direct and proximate cause" of its delay damages, (2) the damages are "naturally and directly traceable to" Leebcor, E.I. DuPont de Nemours & Co., 62 S.E.2d at 255, and (3) the damages are not "attributable to some other intervening cause . . . ." Manss-Owens Co. v. H.S. Owens & Son, 105 S.E. 543, 549 (Va. 1921).

Given the foregoing assessments of fact in this Part IX, the court concludes that McKenney's failed to satisfy this burden, as the record is replete with credible evidence of McKenney's own deficient and untimely work. Because McKenney's failed to disentangle its evidence of alleged Leebcor-caused delay from delay caused by its own shortcomings, it failed to demonstrate that Leebcor was required under the Subcontract to adjust its fixed-price to account for Leebcor-caused delay. See Subc. Ex. 1, § D. For the same reasons, it also failed "prove

with reasonable certainty the measure of damages sustained." Sunrise Continuing Care, LLC, 671 S.E.2d at 137. Accordingly, its claim for damages related to delays occurring after construction began is **DENIED**.

## X. LEEBCOR'S CONSTRUCTION DELAY & REMEDIAL WORK CLAIMS

### A. Critical Path Delay Claim

Leebcor argues that it is entitled to compensation for 95 calendar days of critical path delay on the Project caused by McKenney's deficient performance. Tr. at 1212. Brent Sadauskas, Leebcor's damages expert, opined that this 95-day total resulted from delays occurring during the start-up, test and balance ("TAB"), and commissioning processes attributable to McKenney's. The court briefly describes the relevant processes before taking up the alleged delay periods.

#### 1. Description of the TAB, Performance Verification, & Commissioning Processes

There were four main stages of testing of McKenney's systems that were supposed to occur in the following sequence:

(1)   internal quality control checks completed by McKenney's;

(2)   third party quality assurance checks, also known as the TAB process, completed by someone other than McKenney's (in this case, AET);

(3)   performance verification testing ("PVT"), the Government's check of the systems it purchased prior to acceptance; and

(4) commissioning, the final start-up of all of the systems checked.

Tr. at 437-38, 542, 1193-96.

During the first step of the process, McKenney's was to check the systems it installed and alert Leebcor once they were ready. Tr. at 1194. The relevant Project Specification provided that McKenney's was to:

> Complete check out and debugging of HVAC equipment, ducts, and controls <u>prior to the TAB engineer arriving at the project site to begin the TAB work</u>. Debugging includes searching for and eliminating malfunctioning elements in the HVAC system installations, and verifying all adjustable devices are functioning as designed. Include as prerequisite work items, the deficiencies pointed out by the TAB team supervisor in the design review report.

DX220 (emphasis added). This was the internal "quality control" ("QC") process that was to occur before the third-party "quality assurance" ("QA") stage. See Tr. at 1193-95. As Sadauskas explained, "after McKenney's had claimed they were done with their work in an area" of Building 3105, "another party was supposed to come in and do the QA of that" area. Tr. at 1194. Once QC was completed, the TAB process could begin in that area.

During the second step, or TAB process, AET, another Leebcor Subcontractor, was tasked with checking McKenney's systems. Van Schoyck explained that this "is the step that happens after the mechanical system is functioning," and is designed to "make sure that all of the supplied diffusers and

the return system [are] functioning based on the design and that the correct [cubic feet per minute ["CFM"] of air] is being delivered at each supplied diffuser as well as the correct . . . gallons per minute ["GPM"] of the hydronic piping system." Tr. at 437. The CFM checks constituted the "air side" of TAB, while the GPM checks occurred during the "water side" of the process.[23] Sadauskas explained that this was supposed to be "mostly a passive activity, not an active activity, . . . because the system is supposed to work." Tr. at 1194.

During the TAB process, McKenney's was also required to "support" TAB, "and when there are problems, immediately make those fixes." Tr. at 1194. Specifically, the Specifications explained that McKenney's was to

> [p]rovide the technical personnel, such as factory representatives or HVAC controls installer required by the TAB field team to support the [duct air leakage testing ("DALT")] and the TAB field measurement work.

DX220.

---

[23] Van Schoyck described the distinction as follows:

> The air side test and balance is the balancing of the air at the supply, diffusers and the return system, and as it indicates, has only to do with the air moving equipment. The water side is the chill[ed] water system and the hot water system and making sure that the control valves are modulating like they're supposed to and that the flows and the pressures at each point are doing what they're supposed to be doing in the water system . . . .

Tr. at 660-61.

Jamie Martin, Director of TAB Operations with AET, testified extensively concerning the manner that the TAB process was supposed to proceed. Tr. at 1418. He was experienced and knowledgeable, and a very credible and clear witness, who explained that as technicians uncovered problems, they would list them on a deficiency log, forward it to the AET office, and AET staff would forward the list to Leebcor. See Tr. at 1431-32, 1499. These lists were known as "deficiency logs."

Theoretically, someone working on the Project should use the log to fix the problems, initial each item as resolved when remedied, and return the log to AET showing that the items were fixed. Tr. at 1439. Martin explained that he "expected" to see a McKenney's or Alabama Controls (McKenney's second-tier subcontractor) employee's initials next to "resolved" items. Tr. at 1439-40. Then, once the issues were resolved, AET would return to the Project and verify the resolution, and then would then mark each as completed on the log. Tr. at 1439. The logs were regularly transmitted to McKenney's. Tr. at 1321. Unresolved issues remained on successively issued logs until they were resolved. Tr. at 1440-41, 1447. In other words, issues accumulated on the deficiency logs until they were rectified.

In all, Martin expected TAB to take 4-6 weeks. Tr. at 1423-24. Initially AET had six team members assigned to the Project. Tr. at 1412-22. At the time AET started TAB, it did not

76

have the interface necessary to control the systems installed in Building 3105. Tr. at 1492. AET needed this interface to connect its computer to the building's system so that it could run TAB tests. Tr. at 1492. As of at least November 6, 2018, AET still did not have the interface. DX1359 at MCK_0093880. The "air side" of the TAB process was completed on January 25, 2019. Tr. at 514; DX777. The "water side" of the process was complete the following week. Tr. at 1536-37.

At step three, Arnulfo "Arnold" Taganas was the USACE mechanical contracting officer technical representative responsible for completing the Government's performance verification testing ("PVT"). Tr. at 439, 1336. PVT is a "sample of the systems" that the Government conducts and "they decide what testing is going to be done . . . ." Tr. at 365. It is the method the Government uses to verify that the systems they purchased are functioning properly in accordance with the design. Tr. at 438.

Patrick Curley, with AET, was the commissioning agent responsible for completing the final step of the process. Tr. at 438. Commissioning is "the very final checking that's done by a third-party agent," and McKenney's was to "support that effort." Tr. at 344. Martin had no involvement in the commissioning process. Tr. at 1491. Commissioning was completed in late March 2019. Tr. at 653.

77

Several specialized pieces of equipment are important to be aware of when assessing how the TAB, PVT, and commissioning processes developed. One is the variable air volume terminal, or "VAV." Tr. at 1436. VAVs control the volume of air moving through an HVAC system, and adjust themselves in accordance with system programming to provide the amount of air called for by the design. See Tr. at 1443-44. They may also have a heating element inside. Tr. at 473. On the Project, those elements were hot water coils. Tr. at 473-74. There were around 137 VAVs in Building 3105. Tr. at 474.

Another important piece of equipment is the dedicated outside air unit, or "DOAS." Tr. at 477. These supply outside air to the HVAC system for distribution throughout the space the system services. See Tr. at 494.

### 2. Delayed Rooftop Equipment Start-Up & Installation Verification (14 Days)

Sadauskas testified that McKenney's caused fourteen (14) days of critical path delay during the period of November 1 through November 30, 2019. Specifically, he asserts that McKenney's failed to complete its rooftop equipment start-up and installation verification (Activity GHT-1000) in accordance with the schedule. See DX114 at LEEB_000045459.[24] He noted that

---

[24] This was the activity identified in Sadauska's demonstrative presentation. See Sadauskas Demonstrative 1 at Slide 10.

according to the relevant project schedule, "this equipment start-up/installation verification was supposed to end on November 9" but actually ended on November 30, 2018. Tr. at 1191. According to Sadauskas, 14 of these 21 days were attributable to McKenney's. Tr. at 1191-92.

McKenney's may very well have been behind schedule during this period. However, the court concludes that Leebcor has failed to demonstrate by a preponderance of the evidence that delays to the Project arising during this period are attributable to McKenney's failure to timely complete Activity GHT-1000. This is because the court concludes that other activities outside of McKenney's scope of work were delaying the completion of successor activities.

For instance, as of at least November 6, 2018, AET did not have the interface necessary to control the systems to be tested in Building 3105. See DX1359 at MCK_0093881. In addition (and as explained in greater detail below) at least some of the deficiencies uncovered during TAB that persisted through the month of November could only be remedied with the assistance of Leebcor's design consultant.[25]

---

[25] See infra Part X.A.3.b.i. The court recognizes that these should have been uncovered during McKenney's pre-TAB QC, but the court cannot speculate as to how long it would have taken Leebcor and its design team to remedy the issues, had they been timely discovered. The relatively long time it ultimately took

Given the lack of record evidence on the issue, the court cannot reconcile a claim of 14 days of delay attributable solely to McKenney's from November 1 through November 30, 2018, when there were multiple other issues apparently holding up the TAB process and Project completion.

### 3. Extended Duration for PVT Checks (45 Days) & Delayed Start and Extended Duration of Performance Verification (36 Days)

Leebcor contends that McKenney's was responsible for 81 days of critical path delay to the Project stemming from McKenney's failure to prepare its systems for the TAB, commissioning, and performance verification processes. The court finds that McKenney's failures undoubtedly contributed to the extended duration of these processes. However, concurrent issues within Leebcor's control also delayed them, and no evidence was offered that would permit the court to disentangle McKenney's deficiencies from those attributable to Leebcor. Therefore, for the reasons explained below, the court finds that Leebcor did not demonstrate by a preponderance of the evidence that any of its alleged delay damages are directly traceable to McKenney's breach, rather than its own conduct. See Rastek Constr. & Dev. Corp., 806 S.E.2d at 748 (quoting Haass & Broyles Excavators, Inc., 355 S.E.2d at 315).

---

the designer to resolve the issues demonstrates that it likely would not have been quick. See id.; infra note 29.

### a. McKenney's Deficiencies

Once McKenney's completed its internal quality control process and alerted Leebcor that the system in an area was ready to be tested, "it's supposed to be an operable system." Tr. at 1195. However, Sadauskas explained "that it wasn't," and that this issue "was the repetitive problem that" caused 81 days of critical path delay attributable to McKenney's from November 30, 2018, through March 31, 2019. See Tr. at 1195. He explained that McKenney's failure to adequately conduct quality control of the HVAC system prior to third-party verification and commissioning caused these delays, largely because this failure required McKenney's to fix problems and the third-party (AET) to retest the system. See Tr. at 1193-1195, 1201. In his opinion, "McKenney's was the root cause for the commissioning process expanding, expanding, expanding and expanding from, . . . November through March." Tr. at 1201.

### i. TAB

Sadauskas's testimony is consistent with the testimony of AET's leader on the Project, Jamie Martin, who was also AET's Director of TAB Operations. Martin testified that when AET arrived on site in early November 2018, AET "found that there was a good deal of [McKenney's] equipment that was not operational, and systems that were operational were not controlling and automatic under the building management system

81

. . . . So lots of it was . . . energized," but there was "no control over it," it was "just running." Tr. at 1424. He explained that because McKenney's "systems were not ready," the TAB process took much longer than expected. Tr. at 1425. The deficiency logs bear this out.

AET issued deficiency logs on the following dates:

- November 2, 2018 (DX866);

- November 9, 2018 (DX1335);

- November 26, 2018 (DX867);[26]

- November 27, 2018 (DX868);

- November 30, 2018 (DX727);

- January 9, 2019 (DX791);[27]

- January 11, 2019 (DX789);

- January 14, 2019 (DX795);

- January 18, 2019 (DX1346); and

- January 23, 2019 (DX793; DX1350).

The logs demonstrate that numerous problems with McKenney's installation and preparation of systems that should have been

---

[26] The correct issue date on this log is November 26, 2018, as the date noted for the most recent deficiency "item" on the log is November 26, 2018, and the log was emailed to Leebcor the same day.

[27] The correct issue date on this log is January 9, 2019, as the date noted for the most recent deficiency "item" on the log is January 9, 2019, and the log was emailed to Leebcor on January 10, 2019.

caught by McKenney's during its internal quality control process plagued AET's work. This is because AET could not even conduct the actual system testing until the deficiencies were resolved. Tr. at 1470-71. Deficiencies in McKenney's work were noted on the very first log issued, Tr. at 1438, 1442-45, and their shortcomings persisted through the TAB process, see DX683 (January 22, 2019, email addressing "Starship final deficiencies"); Tr. at 1466.

The deficiency log issued on November 9, 2018, is a representative example. It listed thirteen (13) deficiencies, including that certain filters were dirty (item 1), DOAS units were not operational (item 2), certain lines were insulated that prevented AET from reading the manufacturer's tag (item 3), grilles were not installed (items 4,5, and 7), that "VAV layouts [were] swapped according to the plans" and that there were labeling discrepancies with numerous VAVs (items 8 through 11). DX1335.[28] Martin testified that all but one of the thirteen issues (number 12) were McKenney's responsibility. Tr. at 1438, 1443-45.[29]

---

[28] The first eight items were the same ones identified in the November 2, 2018, deficiency log. Tr. at 1438-39.

[29] The court agrees that almost all of these items represent McKenney's deficiencies. However, as the court discusses below, the court finds that the deficiency log also addressed design problems for which Leebcor bore the ultimate responsibility to remedy.

Van Schoyck received this log by email on November 9, 2018. DX1335. On November 14, he distributed a version of the log with multiple annotations in the "Resolution" column, commenting on some (but not all) of the deficiencies identified. PX1058 at 4-6. He noted that McKenney's would remedy the dirty filter issue, that the DOAS units were "available to turn on," that AET could "cut and repair" the insulation covering the tags it needed to view, that ceiling was not installed where grilles were supposed to be placed, that McKenney's had installed tags on the unlabeled equipment, and that Alabama Controls was remedying the "swapped" VAV layouts. Id. These were all problems that McKenney's was responsible for remedying.

These resolutions were largely unsatisfactory, and at least one of the problems with McKenney's work remained unresolved for months. As Martin explained, item number 8 concerned labels on many of the VAVs that did not match how they were identified in the HVAC control system. See Tr. at 1436-37. This meant that when AET technicians attempted to test the system and activate certain VAVs, they were actually "manipulating something on the other side" of the area being tested. Tr. at 1437. Although Martin "was told that [this] was a minor issue" that could be "fix[ed] in a few hours," AET had to "physically . . . go through every box," and reidentify it in the controls system. Tr. at 1437-38. The issue "was fixed months" after it was

discovered. Tr. at 1438. This problem fell within McKenney's scope of work. Tr. at 1438.

AET left the job site in December 2018 because deficiencies were not being resolved. Tr. at 1454. It was not requested to return to the site in December, and ultimately came back in January 2019. Tr. at 1456; DX791. Following its remobilization, AET continued to uncover numerous problems with McKenney's work that delayed the TAB process.

### ii. Performance Verification & Commissioning

Numerous problems also came to the attention of the USACE during its performance verification. This process was delayed due to open TAB deficiencies concerning McKenney's work.

Problems were documented in Taganas's February 12, 2019, email to Dickerson. DX766. This email identified multiple deficiencies with McKenney's systems that Taganas commented on after reviewing the preliminary TAB report from AET. See id. At bottom, the email demonstrated that there were "still open TAB deficiencies that needed to be corrected before" the Project could proceed into "TAB verification." Tr. at 1337. McKenney's and its second-tier subcontractors were responsible for the majority of the listed deficiencies. Tr. at 1337.

On February 22, 2019, Taganas messaged Leebcor employees again to explain issues he uncovered:

> In one of the verification[s] performed, it was
> observed that two dedicated outside air systems
> (DOAS)on the low roof were malfunctioning. One serves
> the bays of Section A. The other is for the bays of
> Section B. DOAS-B shut down on electrical overload as
> explained by McKenney's representative. DOAS-A, on the
> other hand, tripped on damper operation. There had
> been reports submitted indicating that these [sic]
> equipment were [sic] operating in good order. It is
> very disturbing that the two DOAS were found
> malfunctioning where the reports indicated the
> opposite. It seems to appear that the start-up tests
> were accomplished improperly. For this reason, it is
> recommended that a secondary test[] be performed prior
> to functional testing of the commissioning process to
> save time.
>
> In addition, it was also noticed that the heating
> lines on one of the hydronic heaters had
> moisture/condensation, indicating the boilers were
> shutdown.

PX1117 at 3. In general, this email shows that McKenney's failed to identify and remedy problems with its systems during their internal quality control checks, requiring additional tests, and causing delays to the QA process. See Tr. at 1339-44.

Taganas messaged members of the Leebcor team again on February 27, 2019, explaining additional issues uncovered:

> [E]ach water heater room adjacent to laundry was
> toured. The following were observed:
>
> 1. None of the water heaters is in operation. All were
> shutdown.
>
> 2. Several exhaust fans are running where settings are
> satisfied. Others are idle where the settings requires
> these to run.
>
> 3. Several electrical covers of domestic water
> circulating pumps are off. It is an indication [of]
> malfunction.

86

> 4. There is . . . rust streaking down outside the
> insulation of domestic recirculating pipe which is
> probably sign of a leak.
>
> These observations are very disturbing considering
> reports had been provided to indicate that the systems
> or equipment were tested. It seems to appear that the
> reports were provided to satisfy a prerequisite so
> that functional performance testing can be scheduled
> and proceed. But in reality, tests or checks were not
> performed. Quality control is the responsibility of
> the Contractor. At this time, there is a lack of this
> responsibility.

PX1117.

Multiple issues identified in this were within McKenney's

scope of work. Tr. at 1344-48. Van Schoyck noted that overrides

were put in place for the exhaust fans that had not been

removed, preventing their normal operation, and that he was

looking into a problem with an exhaust fan switch. PX1117.[30] The

court also finds that the "rust streaking" issue was

attributable to McKenney's installation of deficient, rusty

piping that subsequently leaked. These issues required

remediation, and caused delays to QA.

---

[30] McKenney's second-tier subcontractor responsible for the
controls systems put these overrides in place for TAB, and
removed them in response to this email on February 27, 2019.
See PX1117. This demonstrates that it was ultimately McKenney's
responsibility to remove the controls before the Government's
PVT.

#### b. Leebcor's Shortcomings

Leebcor's own conduct, and conduct attributable to Leebcor's other subcontractors, caused delays to the QA processes during construction.

### i. Design Issues

Issues with the HVAC system design provided to McKenney's by Leebcor caused issues during the TAB and commissioning phases of the Project.

Item number 13 on the November 9, 2018, deficiency log noted that after several attempts, AET was unable to calibrate VAV-B2-1. DX1335. As Van Schoyck explained, the issue was caused by a problem with the design of the HVAC system prepared by Leebcor's consultant. Tr. at 512. Specifically, he noted that the design called for 100 CFM, which is "a little bit lower than the [VAV] [was] designed to produce . . . ." Tr. at 512. This made it "hard for the VAV to modulate down to" the CFM "that the design engineer required." Tr. at 512. The ultimate resolution required a change to the design, specifically, raising the CFM to "allow that VAV to operate in a better manner than it was . . . ." Tr. at 512; see also Tr. at 646-48.

Design issues with the HVAC system were outstanding until at least March 2019. DX284; DX871. In a March 11, 2019, email, Martin identified three VAVs that AET was "unable to calibrate . . . back in January," and as of the day of the email, Alabama

Controls and AET were "unable to calibrate . . . ." DX871.
McKenney's "foresaw a potential issue" with these boxes before
TAB began "because of the low CFM that was indicated on the
design documents," and "presented a solution prior to [TAB] ever
beginning . . . ." Tr. at 662; see also Tr. at 832-33
(describing the problems noted in this email chain as concerning
"the design prepared by Leebcor's designer"). Ultimately,
however, McKenney's had to wait for Leebcor's design team to
resolve the issue before TAB could be completed. Tr. at 663;
DX871. The issue remained outstanding through at least March 11,
2019. DX871. As of March 11, 2019, McKenney's was waiting on
Leebcor to resolve the design issue. Tr. at 663.

Dickerson recalled that he and Van Schoyck "had many
discussions between [them] and the" designer, at least some of
which were related to the three VAVs. See Tr. at 1391. One such
conversation was documented in email correspondence between
Dickerson and Van Schoyck. DX758. On January 17, 2019, Dickerson
asked Van Schoyck whether McKenney's was "good with what
need[ed] to be done" to address outstanding issues. See DX758.
Van Schoyck responded that he was not and noted that the
question he "asked yesterday was not answered," and asked
whether Dickerson had "discussed [the question] with the"
designer of record. DX758. Dickerson replied that he "forwarded
[Van Schoyck's] question on to the [designer of record] with no

response," and had "called him" the day before, but would "try again today." DX758. In response to Van Schoyck's request for "an updated [deficiency] list," Dickerson shared a purported AET deficiency log (prepared on the same forms that AET used), dated January 13, 2019.[31]

### ii. Project Management Issues

Leebcor's failure to properly manage its subcontractors was a contributing factor to the delayed completion of the TAB process. As Martin explained, he "never saw" a deficiency log with a contractor's initials noting that particular deficiencies were remedied during the Project. Tr. at 1475. He further explained that the extra costs AET incurred were "partially due to the fact that [it was] going back on [its] own to check the items" that "had not been checked off." Tr. at 1475. Even though Martin testified he "expect[ed]" McKenney's to complete this documentation, he also noted that "typically," the completed log would be forwarded to the general contractor, who would then forward it to AET. Tr. at 1476.

In general, the testimony adduced at trial showed that there was significant confusion concerning who was responsible for what in the deficiency log process. This was confirmed by

---

[31] Martin testified that he did not "understand where [the log] came from," but emphasized that it "didn't come from [AET's] office," and that "[i]t must have [come] from somebody in the field . . . ." Tr. at 1484. The court takes up this confusing issue below.

the fact that not a single completed deficiency log with a contractor's initials indicating that deficiencies had been resolved was introduced at trial.

Leebcor directly contributed to this confusion in multiple ways. First, Leebcor shared documents created using the AET deficiency log form with McKenney's that did not come from AET's office. For instance, on January 17, 2019, Dickerson shared what he claimed was the most updated version of the deficiency log with Van Schoyck. See DX758. At trial, Martin disclaimed any knowledge of this form and denied that it came from AET's office.[32] This shows that Leebcor itself failed to adhere to AET's process for managing deficiencies uncovered during TAB. Indeed, it appears that at any one time, different members of the Project team were simultaneously operating off of different deficiency logs.

In addition, as the general contractor responsible for the Project, it was Leebcor's responsibility to coordinate the work of its subcontractors. On this record, it is clear that there was very poor coordination among AET, Leebcor, and McKenney's concerning the resolution of the numerous problems uncovered with McKenney's work during TAB. Although McKenney's deficiencies significantly caused the TAB process to drag on, Leebcor's failure to develop and effectively manage a process

_____

[32] See supra note 31.

91

for addressing the deficiencies in an orderly manner also significantly contributed to these delays.

On top of these issues, Leebcor did not properly perform its duty under the Subcontract to provide bi-weekly schedule updates to its subcontractors. Subc. Ex. A, § D ("[Leebcor] will adjust the Schedule bi-weekly and distribute to subcontractors for progress tracking . . . ."). As Van Schoyck testified, the last updated Project schedule McKenney's received was in November 2018, around the same time TAB began. See Tr. at 413, 521. In a January 8, 2019, email to Wolfe, Van Schoyck noted that he had "not seen a schedule update since 11/9/2018" and inquired whether Leebcor had "an updated schedule that [it] could send [him.]" PX1081. Still, the court recognizes that weekly meetings occurred during this time period where personnel from McKenney's, Leebcor, AET, and other entities met to discuss ongoing work. See, e.g., DX460; Tr. at 1266-68, 1459. While these meetings were helpful, at least to keep the parties discussing the issues,[33] they were not an adequate replacement for updated schedules demonstrating which items were driving the critical path of the Project.

---

[33] It is clear to the court that an acrimonious relationship developed between McKenney's and Leebcor, particularly during the final six to eight months of the Project, with McKenney's often "dragging its feet."

For these reasons, the court finds that Leebcor failed to coordinate its subcontractor's work during the QA process, causing delays to Project completion.

### iii. Ceiling Installation

The "air side" of the TAB process was completed on January 25, 2019, the same day that the final acoustical ceiling tile was installed in Cadre. See Tr. at 512-14; DX94 at LEEB_000036250 (Activity 2F-1300 Acoustical Ceiling Tile - Cadre FLR 2), LEEB_000036254 (activity HVAC-1060 TABS Execution). Area F, located in Cadre, was the final area of Building 3105 that the "air side" of TAB was occurring. Tr. at 512-13. TAB cannot be completed until the ceiling is installed, and it was Leebcor's other subcontractor's job to install it. See Tr. at 494, 511-12. Accordingly, based on the as-built project schedule, this TAB was completed the first day that it could have been.

Still, the court recognizes that McKenney's employed this fact as a bit of a red herring at trial. While McKenney's made much ado of the fact that the ceiling tiles were not installed in certain areas during TAB, Van Schoyck himself admitted that "McKenney's scope . . . does not require the ceiling to be complete in that state. It is the [TAB] activity that can't complete before that." Tr. at 515. The court therefore finds

93

that McKenney's was not delayed in completing its scope of work due to missing ceiling.

But the fact that the air side of TAB was completed on the same day that the ceiling was installed nevertheless undercuts Leebcor's argument that, but for McKenney's, the process would have been completed sooner. Accordingly, at minimum, this sequence of events demonstrates that ceiling installation was yet another factor outside of McKenney's control that delayed the TAB process, along with McKenney's deficient work.

### 4. Conclusion

Just as McKenney's failed to prove that any portion of the delay damages it seeks were properly attributable to Leebcor, rather than its own shortcomings, Leebcor has not carried its burden to show that any period of delay during the start-up, TAB, PVT, and commissioning processes was caused solely by McKenney's failures. Accordingly, for the same reasons the court concluded that McKenney's delay damages claim must fail, Leebcor's claim for delay damages fails and is **DENIED**.

### B. Damages for Remedial Work

The only supporting evidence for damages concerning Leebcor's costs to remediate McKenney's deficiencies was a description of the additional costs AET incurred to complete the

TAB process.[34] These costs were documented in a change order for sent by AET to Leebcor, identifying $34,990 in additional costs incurred during AET's completion of the TAB and commissioning processes. Tr. at 1429. Martin explained that "the main reason for [this increased cost] was that [AET] never received [the] deficiency list signed off, so [AET] took time to go back to [the listed] issues and items trying to complete" its work. Tr. at 1429. As explained above, the court concludes that Leebcor and other subcontractors were a substantial cause of this issue. Therefore, Leebcor has not demonstrated entitlement to compensation from McKenney's for AET's increased costs, and this claim is **DENIED**.

### XI. MCKENNEY'S CLAIMS FOR UNAPPROVED CHANGE ORDERS

According to McKenney's, Leebcor has also wrongfully withheld payment for several activities McKenney's completed which were beyond the scope of the Subcontract. Specifically, it argues that it is entitled to compensation for work documented in several change order proposals ("COPs") that Leebcor failed to approve, and therefore could not be properly invoiced. However, as discussed below, because McKenney's failed to prove that these activities fell outside of its Subcontract scope of

---

[34] Leebcor did not introduce evidence concerning the additional cost of remedying McKenney's deficient plumbing bracket installation that caused sheetrock and tile problems. See supra Part IX.B.

work, all of its claims relating to the unapproved COPs are **DENIED**.

### A. COP 33 ($15,410) - Ductwork Protection

In COP 33, submitted to Leebcor on September 10, 2019, McKenney's sought payment of $22,973 for capping ductwork with blue plastic prior to transportation to the job site. PX1469. At trial, McKenney's expert explained that $15,410 was properly chargeable to the task. Tr. at 842-43.

However, the record is replete with evidence demonstrating that, for months, McKenney's failed to protect its ductwork during construction as required by the Subcontract.[35] This failure was significant enough to trigger a "for cause" stop-work order on at least one occasion. <u>See</u> DX226. Given this history of performance, it was entirely reasonable for the Government to direct McKenney's, through Leebcor, to cap the ductwork before transport to the job site so that it would be <u>protected</u> <u>and</u> <u>remain</u> <u>clean</u> prior to installation. This is especially true since McKenney's demonstrated its inability to comply with the most basic of ductwork protection measures, such as stacking ductwork in a manner to prevent it from being damaged, and covering the stacks with plastic before

---

[35] <u>See</u> <u>supra</u> Part IX.A.2.

installation on the job site. At bottom, the Specifications required McKenney's to comply with this direction.[36]

Accordingly, McKenney's was required to protect the ductwork in the manner directed by the USACE, and it is not entitled to additional compensation for covering the ends of the duct with plastic for transport and storage on the job site prior to installation. McKenney's claim relating to COP 33 is therefore **DENIED**.

## B. COP 29 ($19,960) – Gutter Drain

COP 29, submitted September 10, 2019, asserted increased costs of $24,894 for the installation of certain rainwater gutter drain piping on Building 3105. PX1466. Trentini's testimony summarized McKenney's version of events that formed the basis of this claim:

> [W]hen the project was started, and the demolition contractor went through and started demoing, they removed piping that should not have been removed. We were asked to reinstall the piping that had been removed, and so our scope increased relatively significantly in this area because of having to re-install piping that was meant to stay.

Tr. at 224. However, there is nothing in the record to credibly support this opinion that removal of the piping during demolition was improper.

In Leebcor's view, on the other hand, this work was not the subject of a proper COP, as it was within McKenney's scope of

---

[36] See supra Part IX.A.1.

work. DX532. Zervakis pointed out that "McKenney's acknowledged on several occasions that they completed this work" during the construction of previous Starship-style buildings, and that the work was "included in the McKenney's bid day price . . . ." Id.

In sum, the parties presented very little evidence on this issue at trial. Ultimately, however, it was McKenney's burden to demonstrate that Leebcor was duty-bound to pay it an additional sum beyond its fixed price for completing this work. See Subc. § 3. McKenney's failed to adduce evidence demonstrating that the Project construction documents did not require the installation of this piping. Therefore, McKenney's has failed to show by a preponderance of the evidence that Leebcor breached the Subcontract by failing to compensate it for these costs.[37] Accordingly, McKenney's claim relating to COP 29 is **DENIED**.

## C. COP 32 ($7,013) – Chilled Water Piping Insulation

McKenney's submitted COP 32 in September 2019 for additional costs incurred to replace insulation over certain pipes that it had already installed. PX1468.

As part of McKenney's scope of work, its insulation subcontractor, Insulcon, installed "foamglas" insulation over certain chilled water piping in Building 3105. Tr. at 442.

---

[37] The court also notes that the RFP required that "[a]ll replaced systems shall be demolished," and defined "[i]nfrastructure/systems" to include "plumbing." PX2/DX71 at LEEB_000000086. This suggests that McKenney's should have expected the gutters at issue to have been demolished.

Although the design Leebcor provided McKenney's permitted the use of multiple types of insulation for this task, including foamglas, the RFP did not. Tr. at 442. Instead, the RFP provided that only "flexible elastomeric" insulation was to be used. Tr. at 442; PX2/DX71 at LEEB_000000115 (requiring "1.5" closed cell flexible elastomeric insulation for all cold piping").

When the Government observed Insulcon installing the incorrect material, it "called out to Leebcor that it was not compliant with the [RFP]." Tr. at 442. Leebcor then required McKenney's to remove the foamglas and replace it with flexible elastomeric insulation to comport with the RFP. See Tr. at 442. McKenney's sought to recoup the additional expense of this replacement through COP 32.

During the Project, Wolfe conceded that this discrepancy was a design error, and explained that Leebcor would be "pursuing a backcharge against GMC," Leebcor's design subcontractor. See PX860 at 3. He even agreed that Leebcor would "split the cost of [the] design deficiency in some fashion," challenging Van Schoyck to "[h]old [him] to it . . . ." PX 860 at 1.

Despite these representations, the Subcontract provided that where multiple construction documents conflicted, McKenney's was to adhere to the "stricter" provision. Subc. § 27. This demonstrates an agreed-upon allocation of risk for

discrepancies, under which McKenney's was responsible for ensuring that the construction documents did not establish conflicting requirements, or at least that it was adhering to the "strict[est]" of them. Accordingly, it was McKenney's duty to discover the conflict giving rise to the insulation confusion, and address it with Leebcor prior to installing the unacceptable material.

In addition, even assuming that there is no statute of frauds issue concerning the apparent agreement to "split the cost" of the remedy, the agreement documented in Wolfe's email is far too vague to enforce. No record evidence demonstrates how the parties purportedly agreed to split the cost of replacing the foamglas insulation with flexible elastomeric, and the court will not guess as to how it would have been apportioned. See Albanese v. WCI Cmtys., Inc., 530 F. Supp. 2d 752, 763 (E.D. Va. 2007) (Lee, J.) ("An enforceable contract must contain terms that are 'sufficiently definite to enable a court to give it an exact meaning.'" (quoting Smith v. Farrell, 98 S.E.2d 3, 7 (Va. 1957))). Accordingly, McKenney's has failed to demonstrate entitlement to payment for the insulation replacement, and its claim related to COP 32 is **DENIED**.[38]

---

[38] Of course, nothing in this Opinion and Order prevents Leebcor from making good on its abstract statement of intent to help with these costs.

### D. COPs 31,34, & 35 ($31,711) — Water Quality Work

Due to water quality issues at Fort Benning, the water supply to Building 3105 was dirty. Tr. at 554-57. This issue was first identified in March 2019. DX284. Van Schoyck explained that "sand and dirt and mud" had accumulated on the strainer protecting the water connection for Building 3105, which "indicate[d] that [the debris] had been all throughout the piping system." Tr. at 554; PX1210. This "clogged the orifices of the shower[s] and prevented [them] from functioning properly." Tr. at 554-57. In an April 17, 2019, email concerning the issue, Wolfe explained that "a lot of the problems" concerning shower operation were "stemming from a well-known issue [at Fort Benning]: water quality issues in piping outside the building footprint . . . ." PX1210.[39]

COPs 31, 34, and 35, and the related damages McKenney's seeks in this litigation, concern excess costs McKenney's incurred addressing water quality issues so that it could deliver a fully functioning plumbing system. PX1467 (COP 31); PX1470 (COP 34); PX1471 (COP 35). The work continued intermittently into September 2019. Tr. at 556; PX1293.

---

[39] The specific issue was dirt accumulating in the controls for the showers. Trentini explained that "there's a tiny little . . . shuttle" in each shower handle that "moves as you move the handle," and the dirt that was in the water was preventing the shuttles from moving, which meant that the user "could not control the temperature" of the shower water. Tr. at 198-99.

McKenney's did not include the cost of dealing with potential water quality issues in its Subcontract price. Tr. at 365. Instead, McKenney's submitted COPs 31, 34, and 35 to Leebcor, seeking additional compensation for the work it did to address the problems associated with the poor water quality. However, just because McKenney's failed to consider the potential for increased costs due to water quality issues, it does not necessarily follow that Leebcor was responsible for absorbing such costs.

Every agreement between a subcontractor and a general contractor allocates risk. The question here is whether the risk that water quality problems at Fort Benning would require additional work was allocated to McKenney's. The Subcontract did not expressly address the issue of water quality problems, but it did require McKenney's to deliver Leebcor a working plumbing system. See, e.g., Subc. § 1. In addition, McKenney's had completed multiple projects at Fort Benning, and should have been aware of the potential for water quality issues, given that it was a known problem among contractors on post. See PX1210. Leebcor and McKenney's both had access to Fort Benning and Building 3105 prior to the Project, and were therefore able to investigate the water quality when bidding the job.

For these reasons, absent express Subcontract language to the contrary, the court concludes that McKenney's is not

entitled to additional payment for the additional costs it incurred addressing the water quality problems in order to deliver a working plumbing system. It agreed to deliver Leebcor a working plumbing system in Building 3105, and failed to prove that Leebcor, rather than it, was responsible for paying the additional cost of completing the system caused by an unforeseen (but not unforeseeable) site condition. Therefore, McKenney's claim for this change-order work is **DENIED**.

## XII. MCKENNEY'S MILLER ACT CLAIM

McKenney's argues that Cincinnati is jointly and severally liable for the damages it seeks under the terms of the Payment Bond, issued in accordance with the Miller Act. Cincinnati, on the other hand, contends that it cannot be liable because McKenney's failed to timely file this action.

Miller Act actions "must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." 40 U.S.C. § 3133(b)(4). Labor performed "for the 'purpose of correcting defects, or making repairs following inspection of the project,'" does not qualify. United States ex rel. Noland Co. v. Andrews, 406 F.2d 790, 792 (4th Cir. 1969) (quoting United States ex rel. Austin v. W. Elec. Co., 337 F.2d 568, 572-73 (9th Cir. 1964)). Still, because of its remedial purpose, the Miller Act "is to be given a liberal construction 'in order

properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects.'" United States ex rel. Sunbelt Pipe Corp. v. U.S. Fid. & Guar. Co., 785 F.2d 468, 470 (4th Cir. 1986) (quoting Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tompkins Co., 322 U.S. 102, 107 (1944)).

With this in mind, the court recognizes that "[g]enerally, the word 'labor' in the Miller Act includes 'physical toil, but not work by a professional, such as an architect or engineer.'" United States ex rel. Constructors, Inc. v. Gulf Ins. Co., 313 F. Supp. 2d 593, 597 (E.D. Va. 2004) (Smith, J.) (quoting United States ex rel. Naberhaus-Burke, Inc. v. Butt & Head, Inc., 535 F. Supp. 1155, 1158 (S.D. Ohio 1982)). But "skilled professional work which involves actual superintending, supervision, or inspection at the job site" can be covered. See id. (quoting Naberhaus-Burke, 535 F. Supp. at 1160); United States ex rel. Barber-Coleman Co. v. U.S. Fid. & Guar. Co., 19 F.3d 1431, 1994 WL 108502, at *3 (4th Cir. Mar. 31, 1994) (unpublished table decision) (holding off-site work did not toll statute of limitations). At bottom then, an employee's job title is not dispositive. Instead, regardless of title, when a contractor's employee is on-site, working on tasks required to complete the project rather than internal administrative work, and which are not for the purpose of correcting defects or repairing

104

already-completed work, he is providing "labor" within the meaning of the Miller Act. See Noland Co., 406 F.2d at 792-93.

On May 29, 2019, McKenney's conducted training on the operation and use of controls systems it installed. PX1244; Tr. at 552. This was base-scope Subcontract work identified as task CP-1190 in the as-built Project schedule, DX94 at LEEB_000036255, and McKenney's was required to complete it under the Subcontract, see id.; PX1229; Tr. at 550. Indeed, the training had to be done before McKenney's could receive final payment on the Project or complete the final closeout. Tr. at 550-51; PX1229.

Providing classroom training concerning the use of already-installed systems is hardly the bricklaying, framing, site preparation, or similar arduous work usually envisioned as "labor" under the Miller Act. Nevertheless, the court concludes that conducting the May 2019 training still qualifies. The Fourth Circuit has previously explained that the fact a task was "called for by both the primary contract and the subcontract" was "dispositive of the issue" of whether completing the task constituted the provision of labor or materials, even though the work was done after the government had already accepted the project. See Noland Co., 406 F.2d at 792.[40] This approach is the

---

[40] The specific task at issue involved the delivery of valves to a project by one party, and the installation of the

proper way to define the limits of "labor," as courts are ill-equipped to conduct the line drawing that would necessarily ensue if tasks must involve a threshold level of sweat to constitute "labor" under the Act. It is enough here that McKenney's employees were on site, working on a non-remedial task required to complete the Project, rather than administrative tasks, within the limitations period.

Accordingly, the court holds that McKenney's timely-filed its action, and that Cincinnati is therefore jointly and severally liable for the amounts owed by Leebcor to McKenney's pursuant to this Opinion and Order.[41] The Clerk is **DIRECTED** to enter judgment to this effect.

---

valves by a different party. *Noland Co. v. Andrews*, 406 F.2d at 791-92. The entire relevant passage reads as follows:

> It seems plain to us that the installation of the two missing valves cannot be characterized as a mere correction of a defect. The fact that the valves were called for by both the primary contract and the subcontract and were not furnished till January 17, 1967, is dispositive of the issue . . . .

*Id.* at 792 (emphasis added).

Although the Circuit Court was squarely addressing whether the delivery tolled the limitations period, or was instead remedial work, its reasoning is applicable to the issue of labor as well.

[41] At summary judgment, Cincinnati also argued that certain damages claimed by McKenney's were not recoverable under the Miller Act, even assuming it timely filed its claim. *See* ECF No. 119 at 10-12. Cincinnati apparently abandoned this argument, as it did not raise the issue at trial. However, even if it had,

## XIII.  LEEBCOR'S CLAIM AGAINST THE PERFORMANCE BOND

Leebcor argues that Hartford is liable for McKenney's breaches of the Subcontract as the guarantor of the Performance Bond it issued. For the reasons explained above, Leebcor is not entitled to any funds from McKenney's, and, therefore, even assuming Leebcor had complied with the terms of the Performance Bond, it could not pursue payment from Hartford for any sum. However, the court also holds that Leebcor's failure to give reasonable notice of McKenney's default breached the terms of the Performance Bond, providing an alternative reason Leebcor is not entitled to payment from Hartford.

To recover from Hartford, Leebcor must first prove that it has "performed the conditions under which [Hartford] has promised to recompense [it] for loss suffered." Am. Sur. Co. v. Plank & Whitsett, Inc., 165 S.E. 660, 663 (Va. 1932); see Hunt Constr. Group, Inc. v. Nat'l Wrecking Corp., 542 F. Supp. 2d 87,

---

the court concludes that the damages awarded McKenney's in this case are all properly recoverable under the terms of the Payment Bond and the Miller Act because they constitute unpaid amounts for McKenney's base contract work and approved change orders for non-remedial tasks. See United States ex rel. E. Waterproofing & Restoration Co. v. Berkley Reg'l Ins. Co., 986 F. Supp. 2d 660, 665 (D. Md. 2013) (explaining that if "a subcontractor fully performs its contractual obligations, but the prime contractor fails or refuses to pay the subcontractor," the surety must "'pay the compensation to which the parties have agreed, although this amount exceeds the cost of labor, materials, and overhead.'" (quoting United States ex rel. Woodington Elec. Co., v. United Pac. Ins. Co., 545 F.2d 1381, 1383 (4th Cir. 1976)).

95 (D.D.C. 2008). The relevant language from the Performance Bond contract is as follows:

> Whenever [McKenney's] shall be, and be declared by [Leebcor] to be in default under the subcontract, [Leebcor] having performed [Leebcor's] obligations thereunder:
>
> (1) [Hartford] may promptly remedy the default subject to the provisions of paragraph 3 herein, or;
>
> (2) [Leebcor] after reasonable notice to Surety may, or [Hartford] upon demand of [Leebcor] may arrange for the performance of [McKenney's] obligation under the subcontract subject to the provision of paragraph 3 herein;
>
> (3) The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract. If completed by [Leebcor], and the reasonable cost exceeds the balance of the subcontract price, [Hartford] shall pay to [Leebcor] such excess, but in no event shall the aggregate liability of [Hartford] exceed the amount of this bond. If [Hartford] arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete the subcontract or remedy the default and o [sic] reimburse [Hartford] for its outlays shall be paid to [Hartford] at the times and the manner as said sums would have been payable to [McKenney's] had there been no default under the Subcontract.

ECF No. 167-1 (emphasis added).

In sum, the Performance Bond provides two potential remedies for McKenney's deficient work. First, if Hartford had learned of McKenney's default, it was permitted to remedy the deficiency without notice to Leebcor. Second, after notice of McKenney's default to Hartford, Leebcor was permitted to make

alternative arrangements for McKenney's performance (or demand that Hartford do so), and receive payment for additional costs incurred. Under the second option, Hartford's liability would only have been triggered upon receipt of reasonable notice of McKenney's default. See Hunt Constr. Group, Inc., 542 F. Supp. 2d at 95-96. Nothing in the Performance Bond provides that Hartford must compensate Leebcor for alleged deficiencies absent reasonable notice of default. See id. (reaching same conclusion with nearly identical contract language).

"Though not defined in the [Performance Bond], reasonable notice is generally described as notice conveying the requisite information and permitting time for response." Siegfried Constr., Inc. v. Gulf Ins. Co., 203 F.3d 822, 2000 WL 123944, at *5 (4th Cir. Feb. 2, 2000) (unpublished table decision) (citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)). Notice to a performance bond surety is reasonable when it provides the insurer "time to respond and exercise its options under the bond." See id. at *6. When one such option is for the surety or benefitted party to arrange for alternate performance, with the surety paying for the increased cost, this requires notice that would permit the performance bond surety to do something to remedy the deficiency while the job is ongoing. See Hunt Constr. Group, Inc., 542 F. Supp. 2d at 95-96. Leebcor failed to provide Hartford such notice.

Leebcor first notified Hartford of problems with McKenney's performance on March 2, 2021. PX1331; Tr. at 998-1001 (Mileski testimony conceding that Leebcor did not provide notice during Project). This was almost two (2) years after the Project was complete, and almost a year after McKenney's filed its Complaint in this litigation. Leebcor's decision to sit on its hands deprived Hartford of any opportunity to exercise its options under the Performance Bond to address the deficiencies Leebcor identified, which could have limited the damage they caused Leebcor. Therefore, the court concludes that Leebcor failed to satisfy a condition precedent to Hartford's obligation to pay, and the claim against Hartford is **DISMISSED**.

## XIV. MCKENNEY'S CLAIM FOR ATTORNEYS' FEES

McKenney's seeks attorneys' fees and other costs it has incurred in this litigation because it asserts that Leebcor's failure to pay it, and instead file counterclaims and claims against Hartford, were actions taken in bad faith. However, neither the Subcontract, nor general principles governing the award of such expenses, entitle McKenney's to such relief. This court finds no bad faith, just government contract disagreements and an acrimonious relation between the prime contractor and one of its subcontractors.[42]

---

[42] See generally supra note 33.

The Subcontract provides that, "[i]n the event of any action arising out of or relating to [the Subcontract], each party shall bear its own costs and expenses, including attorney's fees, incurred in connection with such action." Subc. § 14 (underlining omitted). The provision also memorializes why the parties arrived at this conclusion: "both [Leebcor and McKenney's] are large enough to handle on fees if this occurs[.]" Id. (underlining omitted).

This is consistent with the general rule in American litigation that each party pay their own costs, absent a contractual agreement to the contrary. See Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991). Nevertheless, as part of its inherent authority to impose sanctions, "a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Id. at 45-46 (collecting cases and quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59 (1975) (quoting F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 129 (1974)) (internal quotation marks omitted)).

Leebcor's decision to retain the money McKenney's earned under the Subcontract, even after the Government had paid it for the work, was unjustified for the reasons explained above. However, the court concludes that neither this, nor the assertion of claims against McKenney's or its bonding company,

or any other conduct at issue in this litigation warrants sanction. Although some of Leebcor's acts stemmed from incorrect interpretations of the Subcontract, the contract interpretation and resulting conduct was neither outlandish nor extreme so as to display bad faith or oppressive intent. Moreover, the factual issues in this case were highly complex, and subject to an array of reasonable interpretations prior to the court making its findings.

These two parties were at odds over things that mattered and things that did not, as reflected in the record and in this Opinion and Order. The court finds no "bad faith" here on the part of Leebcor. Accordingly, McKenney's claim for attorneys' fees is **DENIED**. Subcontract § 14 controls, with each party bearing "its own costs and expenses, including attorney's fees." Id.

## XV. CONCLUSION

A claimant arguing entitlement to damages under a contract governed by Virginia law must do more than show their counterparty violated the governing instrument. It must demonstrate a "causal connection between the . . . breach and the damages claimed," Haass & Broyles Excavators, Inc., 355 S.E.2d at 315, and "prove with reasonable certainty the measure of damages sustained," Sunrise Continuing Care, LLC, 671 S.E.2d at 137 (emphasis added). Neither McKenney's nor Leebcor proved

112

entitlement to any measure of damages related to delays allegedly caused by the other during construction, because neither disentangled their allegations from extensive record evidence of contemporaneous causes of delay not attributable to the counterparty.

Still, McKenney's provided, Leebcor accepted, and the Government paid Leebcor for certain work called for in the Subcontract. Accordingly, McKenney's is entitled to payment of its Subcontract balance for the reasons described in Part XII, and as set forth below. The Clerk is therefore **DIRECTED** to enter judgment against Leebcor in favor of McKenney's, with prejudgment interest at the rate of six (6) percent pursuant to Va. Code Ann. § 6.02-302(B), accruing as follows:

(1) $159,988.14, with prejudgment interest accruing as of March 2, 2019;

(2) $88,270.75, with prejudgment interest accruing as of April 28, 2019; and

(3) $5,527.61, with prejudgment interest accruing as of June 30, 2019.

Cincinnati, as Leebcor's Miller Act payment bond surety, shall be jointly and severally liable for satisfaction of this judgment.

The court further **AWARDS** post-judgment interest at the rate established by 28 U.S.C. § 1961(a), from the date of entry of judgment pursuant to this Opinion and Order until paid in full.

113

All remaining claims are **DENIED** or **DISMISSED**, and this case is closed on the court's docket.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to counsel for all parties.[43]

**IT IS SO ORDERED.**

_Rebecca Beach Smith_
REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

August 18, 2022

---

[43] For reference purposes, an Index of the Opinion and Order is attached hereto as Exhibit A.